# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 5, 2009

Charles R. Fulbruge III
Clerk

No. 07-20661

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

Plaintiff-Appellant

v.

CHEVRON PHILLIPS CHEMICAL CO., LP

Defendant-Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before GARZA and DENNIS, Circuit Judges, and MILLS, District Judge.[*]

JAMES L. DENNIS, Circuit Judge:

This is an enforcement action brought by the Equal Employment Opportunity Commission ("EEOC") pursuant to the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 *et seq*. The EEOC filed a complaint on behalf of Lorin Netterville, who suffers from Chronic Fatigue Syndrome ("CFS"), alleging that her former employer, Chevron Phillips Chemical Company ("CPChem") failed to accommodate her known substantial limitations and discharged her in violation of the ADA. The EEOC now appeals from the district court's grant of summary judgment in favor of CPChem. Because we conclude

---

[*] Chief Judge of the Northern District of Mississippi, sitting by designation.

that the EEOC raises genuine issues of material fact, *viz.*, whether Netterville is disabled under the ADA, whether CPChem failed to accommodate her substantial limitations, and whether CPChem discharged her because of her disability and because she requested accommodations, we reverse and remand.

## I. BACKGROUND

In 1987, while attending school and caring for her children at home, but not otherwise employed, Lorin Netterville suffered her first onset of CFS symptoms. CFS is a syndrome recognized by the Centers for Disease Control and Prevention (CDC)[1] that is characterized by severe fatigue plus four or more symptoms from the following list: "substantial impairment in short-term memory or concentration; sore throat; tender lymph nodes; muscle pain; multi-joint pain without swelling or redness; headaches of a new type, pattern or severity; unrefreshing sleep; and post-exertional malaise lasting more than 24 hours." CDC, CFS Basic Facts, *available at* http://www.cdc.gov/cfs/cfsbasicfacts.htm. There is no diagnostic laboratory test for CFS at this time – it is diagnosed by ruling out other causes for the symptoms presented. *Id.* After being diagnosed and treated for CFS in 1987, Netterville received a six-week course of B-12 and gamma globulin injections, but did not follow up with her doctor for further treatment after the injections because her symptoms disappeared.

Thirteen years later, in December 2000, Netterville began working as a temporary administrative aid for CPChem, and in April 2001 she was hired as a full-time employee. Before CPChem offered Netterville the permanent position

---

[1] The CDC is an agency of the United States Department of Health and Human Services and is considered one of the world's premier public health organizations. Courts often rely on the CDC's recognition of a disease as an indication of its accepted status in the medical community. *See, e.g., Buxton v. Halter*, 246 F.3d 762, 763 n.1 (6th Cir. 2001).

it asked her to complete a medical history questionnaire. The questionnaire included a section titled "Have you ever had, or do you now have" followed by a list of 75 conditions, with instructions to check "yes" or "no" for each condition. CFS was not one of the conditions listed. Netterville answered "yes" to seventeen conditions on the form, including "ringing in the ears," "pneumonia," "high blood pressure," "swelling in the legs," "ulcers," "thyroid problems," "arthritis," and use of "street drugs," and provided explanations for each item. She checked "no" for the other 58 conditions, including "excessive fatigue with work or exercise" and "anemia or other blood condition/blood transfusion." At the end of the form, Netterville signed her name under the statement "I understand that any misrepresentation, false statement, or omission herein may result in the company rejecting my application, withdrawing any offer of employment, or terminating my employment at any time."

As an administrative assistant, Netterville answered and made telephone calls, wrote memos, compiled weekly reports, helped prepare for staff meetings, sorted mail, entered data, made travel arrangements, and performed other general secretarial duties. The parties agree that her job performance was satisfactory, as reflected by her last performance appraisal, which took place a few weeks before her termination.

In May 2002, as CPChem prepared to move the office in which Netterville worked to The Woodlands, Texas, she began working long hours overtime, often manually packing boxes and moving supplies. In June or July of 2002, Netterville began experiencing significant sleep disruptions, which she initially attributed to the stress of working overtime on the move. But after the move her problems worsened, to the point that eventually for two weeks of every month she got no more than one or two hours of sleep a night for six or seven days in a row, and then three or four hours of sleep a night on the remaining days, often waking up every hour. Once a month she would sleep for up to seventeen hours

at a time. Netterville also began to run low-grade fevers and to suffer from headaches, disorientation, pains in her temples, stiff joints, pain in her arms and legs, and numbness in her legs, as well as aphasia and problems with memory, concentration and decision-making – at times she was unable to remember even her own son's name. She was unable to sit or walk for more than thirty minutes at a time, became hypersensitive to light and sound, and experienced crying episodes and feelings of social isolation. By February of 2003, Netterville was living with her sister, who assisted her with daily tasks like cooking, washing, shopping, showering, drying, dressing, and using the bathroom (including wiping herself), largely because of "excruciating pain" in her arms and morning nausea.

The deterioration in her sleeping patterns and ability to perform daily tasks led Netterville to consult Dr. Patricia Salvato, a specialist in immune system disorders, who had initially treated her CFS in 1987. Around January of 2003, Dr. Salvato diagnosed Netterville with a recurrence of CFS. In her affidavit, Dr. Salvato stated that she expected Netterville's CFS-related substantial limitations to be permanent. On February 4, 2003 Dr. Salvato advised Netterville that she should take a month off from work, but Netterville refused because she could not afford to do so. Dr. Salvato insisted that Netterville take at least two weeks off and provided her with a note to CPChem to that effect. The next day, February 5, 2003, Netterville approached Gary Thurman, a customer service manager who supervised her work, and gave him the note. She explained that her CFS had recurred and requested two weeks off, using one week of vacation leave and one week of sick leave. She also gave him material about CFS she had obtained on the Internet, including a fact sheet about the syndrome. Netterville testified that during this conversation she told Thurman that she had been diagnosed with CFS fifteen years earlier and that it had "gone away or had gone into remission." She also said "I know I didn't tell you – all that I had . . . but I had not had symptoms in 15 years, so I really didn't

think I had it and so I didn't see any need to tell you something that I didn't have." When Thurman asked how long she had been experiencing her symptoms, Netterville said "I don't know. Two years?" (Netterville was hired permanently less than two years before the conversation). Netterville testified in her affidavit that her "inability to concentrate" caused her to give Thurman the wrong information, and that when she returned to her desk she realized that in fact she had begun experiencing the symptoms less than a year prior to the conversation, in June or July of 2002 (after she had signed the questionnaire and been permanently hired), but she did not correct this misstatement because, Netterville testified, "the brain fog at that time was pretty severe . . . and it was really affecting [her] memory."

The same day, February 5, 2003, Thurman emailed Steve Rugeley, a Human Resources employee, and told him that Netterville had told him that she was diagnosed with CFS "about 15 years ago, but that it had been in remission until about 2 years ago," and that she needed to take two weeks off. He also told Rugeley that in "other information of note" Netterville told him that "her sister has [CFS] and was, at one time, sick at home for two years." The next day Rugeley forwarded the email to Nancy Zamboras, a nurse in CPChem's medical department, and asked her to determine whether Netterville had noted her previous experience with CFS symptoms before being hired, and, if she had noted it, whether such a disclosure would have "prevented her from being medically acceptable for employment" and whether the condition "is something that would even be disclosed on the questionnaire."[2] Zamboras examined

---

[2] Rugeley's email read in full: "Nancy, is there a way to check Lorin's pre-employment medical questionnaire and see if she disclosed the previous incident of this syndrome? Part two would be, even had she disclosed, would this have prevented her from being medically acceptable for employment? I guess part three would be whether [CFS] is something that would even be disclosed on the questionnaire. Let me know what if anything we can find out. Thanks."

Netterville's pre-employment questionnaire, but focused only on the question about blood disorders, apparently under the incorrect assumption that CFS is a blood disorder. Zamboras then responded to Rugeley that "she did not disclose the syndrome . . . there is a question asking about blood disorders and she indicated a negative response." However, nothing in the record or medical literature suggests that CFS has been identified as a blood disorder. *See, e.g.*, CDC, CFS: Possible Causes, *available at* http://www.cdc.gov/cfs/cfscauses.htm. Further, although CPChem management's internal emails indicate they initially pursued the false theory that CFS is a blood disorder which Netterville would have been required to disclose on her questionnaire, CPChem subsequently abandoned that hypothesis and did not urge it here or in the district court.

Netterville was granted the two weeks of leave beginning on February 6, 2003. On February 18 she returned to Dr. Salvato for a follow-up appointment. Dr. Salvato released her to return to work with a note that said, "[r]eleased to return to full-time employment at a sub-station closer to her home." Netterville brought this note to Thurman but, according to Netterville, he refused to discuss the possibility of relocating to an office nearer to her home, saying, "No. We just can't take this. This isn't going to work." On February 20 Dr. Salvato issued a second release allowing Netterville "to return to her regular job duties, effective 2/21/03," subject to limitations contained in the release:

> Lorin Netterville is currently under my care for Chronic Fatigue Syndrome . . . . In reference to restrictions and limitations, Chronic Fatigue Syndrome is a self-limiting condition which produces symptoms of fatigue, muscle and joint pain and intermittent concentration difficulties . . . . In Ms. Netterville's case, she does suffer from neuropathy-type hand pain and concentration difficulties necessitating the need to alternate typing and reading, rather than typing for prolonged periods or reading for prolonged periods. In addition, it would not be unusual for her to require a short nap during her lunch break. These are reasonable

accommodations which would not prevent her from performing her job duties.

According to Netterville, when she presented this second release to Thurman he "remained silent" and did not agree to grant or deny the accommodations in the note. However, Netterville was allowed to return to work. She testified that on her own initiative she alternated her typing and reading tasks and rested during her lunch hour for the last four work days prior to her termination.

Meanwhile, on February 19, 2003 Rugeley forwarded to Thurman Nurse Zamboras' conclusory – and apparently incorrect – statement, which assumed that CFS was a "blood disorder" and thus concluded that Netterville had failed to disclose it on her questionnaire. In the same email, in reference to an upcoming meeting about Netterville, Rugeley wrote:

> The first issue is to get [Netterville] to formally disclose via statement from her physician including any restrictions. We can then run through medical and ask if disclosure would make her unacceptable for employment. Second I'd get with [Peter Borths, director of labor relations for CPChem] and see if we would terminate for falsifying the employment documents no matter what the answer from medical might be. Or does the answer from medical give us the answer to termination or continued employment.

On Monday February 24, 2003 Rugeley faxed a copy of Dr. Salvato's second release to Nurse Zamboras for her review, noting "I do find the choice of words in the doctor's statement interesting" and asking Zamboras for "input from the medical perspective," specifically as to whether CPChem would "have disqualified Ms. Netterville from employment had she disclosed Chronic Fatigue Syndrome on her pre-employment medical questionnaire," and whether "we have a safety issue with having someone with this condition on the job." The record does not indicate any response from Zamboras to this fax.

Two days later, on Wednesday, February 26, 2003 Thurman and Rugeley met with Netterville. Neither of them had ever seen the questionnaire and they did not bring a copy to the meeting. The meeting seems to have focused on

7

Zamboras' conclusory and inaccurate characterization of CFS as a "blood disorder" and her opinion that Netterville should thus have checked the box on the questionnaire concerning "anemia or other blood condition/blood transfusion." It does not appear that Thurman and Rugeley asked Netterville about her response to the "excessive fatigue with work or exercise" item on her questionnaire, even though CPChem contends on appeal that this was the question Netterville should have answered differently. During the meeting Rugeley also asked Netterville why she had not mentioned CFS on the questionnaire. Netterville explained that she had experienced CFS symptoms fifteen years earlier, that her CFS had apparently gone into remission, and that she had been re-diagnosed with it after becoming a permanent employee. She explained that at the time she filled out the questionnaire she did not think she had CFS and thus would have had no reason to consider mentioning it. In Netterville's deposition she further testified that the language on the questionnaire – "with work or exercise" – suggested to her that the question was whether she had fatigue caused by or associated directly with work or exercise. At the time that she suffered her first bout of CFS symptoms, in 1987, Netterville was not working outside her home – and she testified that her symptoms of fatigue were constant and not associated with either work or exercise. Further since she had not had any symptoms since 1987 she said she had become convinced that she had never had CFS in the first place.

During the meeting Rugeley and Thurman also asked Netterville about when her symptoms had returned and what she had told Thurman about the date of their recurrence. Netterville testified that she tried to make clear that her CFS had recurred after she answered the questionnaire and was permanently hired but was not certain that Thurman and Rugeley had understood her. At the end of the meeting Rugeley told Netterville she was suspended without pay until they could look at her medical questionnaire to see

if she had misrepresented her medical history. An email from Thurman to Rugeley containing notes from the meeting includes a postscript indicating that after the meeting Netterville returned to tell Thurman that her CFS "had not been identified until 'much later.'" The next day, February 27, 2003, Rugeley and Thurman called Netterville at home and informed her that she was being terminated for "falsifying" information on her medical questionnaire.

In September 2005, the EEOC filed suit on Netterville's behalf against CPChem, alleging that CPChem failed to provide reasonable accommodations for Netterville's disability and discharged her because she had a disability and in retaliation for requesting a reasonable accommodation. CPChem moved for summary judgment. On May 29, 2007, the magistrate judge, in an unusual procedure, questioned Netterville directly under oath, because Netterville's symptoms "seem to have gotten much more severe in [her] affidavit than they were at the time of [her] deposition."[3] During the magistrate judge's questioning, Netterville explained that as of February 2003 her cognitive deficits lasted from half an hour to a couple of hours daily, but that she was able to do some routine work tasks during these periods, and that the periods of alternating typing and reading had more to do with pain in her hands than with cognitive difficulties. She also testified that she was suffering from "joint and muscular problems, muscular pain, in arms, legs, back, neck, shoulders" for which she took pain

---

[3] Although the EEOC does not directly challenge the magistrate judge's authority to question Netterville in this manner, it bears noting that this procedure is unusual and arguably inappropriate at the summary judgment stage. The very fact that the magistrate judge questioned Netterville about perceived discrepancies between her deposition and affidavit tends to indicate that the magistrate judge was weighing evidence and resolving conflicts in the summary judgment evidence, and failing to give the plaintiff the benefit of all favorable inferences that could be drawn. *See, e.g., Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 436 (5th Cir. 2005) (noting that a district court cannot make credibility determinations or weigh the evidence when deciding a summary judgment motion); *EEOC v. R.J. Gallagher Co.*, 181 F.3d 645, 652 (5th Cir. 1999) (noting that the parties presented "a factual dispute which must be resolved by the ultimate fact finder, not by the judge on summary judgment").

medication that lessened but did not eliminate her pain, and that she had headaches at least three times a week and low-grade fevers in the afternoons.

The magistrate judge then questioned Netterville about the extent to which her condition limited her daily activities. Netterville explained that her symptoms were worst in the morning, that she needed to rest between showering and dressing herself, and that she gained in stamina as the day went on. Netterville testified that she had concentration problems while driving and often missed exits or even fell asleep at the wheel. Netterville also explained that Dr. Salvato had increased the dosage of her antidepressant medication around the time she requested the two weeks of medical leave and that this increase, along with Ambien, helped her to begin sleeping better by the time she returned to work. Overall, Netterville testified, when taking the proper combination of medications and treatments her symptoms were better and she was able to work with accommodations, but she still suffered from fatigue, pain in her hands and legs, and trouble thinking, even upon her return to work. The magistrate judge apparently rejected Netterville's explanation of her symptoms and limitations, saying:

> So then, I'm trying to figure out still how this is all working, because it sounds like in the mornings you had pain; could not manipulate your fingers well enough to put on your clothes; couldn't shower or wash your hair; couldn't perform other bathroom tasks; had difficulty driving to work, but then you go to work and you were able to perform your job? That's where I'm having the hard time figuring that out. It doesn't - I just don't understand how that works. . . . I'm having a hard time reconciling the fact that you're saying "I, you know, can't take a shower; I can't wash my hair; I can't put on my own clothes; but if I really wanted to, I could do my job." . . . Either you can do it or you can't. . . . If you need time off, that is being unable to do your job.

On June 5, 2007 the magistrate judge recommended that CPChem's motion for summary judgment be granted. The magistrate judge concluded that "[i]n light of Netterville's testimony, it appears that she suffers from

10

intermittent manifestations of chronic fatigue syndrome and has experienced short-lived, non-permanent and non-severe impairments in the areas of sitting, standing, sleeping and caring for herself," and thus, "[b]ased on the record in this case, no reasonable jury could conclude that her impairments substantially limited her ability to sit, stand, sleep or care for herself." Therefore, according to the magistrate judge, no reasonable jury could find that Netterville had a disability within the meaning of the ADA, and thus no reasonable jury could find that CPChem had discriminated against her for having one. Alternatively, the magistrate judge found that, even if Netterville were disabled under the ADA, her "falsification" of the medical questionnaire furnished a legitimate nondiscriminatory reason for CPChem to discharge her and no reasonable jury could find that this explanation for her discharge by CPChem was pretextual. Finally the magistrate judge found that while Dr. Salvato's first release did not constitute a request for accommodation, Netterville was engaging in protected activity when she presented Dr. Salvato's second release and the accommodation request to alternate her tasks of typing and reading and to rest during her lunch break, but that CPChem had in fact granted this second set of requested accommodations. The district court adopted the magistrate judge's reasoning and recommendations and granted CPChem's motion for summary judgment.

## II. THE ADA

The ADA, 42 U.S.C. §§ 12102 *et seq.*, provides that no covered entity shall "discriminate" against a qualified individual with a disability because of the disability of such individual in regard to, *inter alia*, "the hiring, advancement, or discharge of employees . . . and other terms conditions, and privileges of employment." § 12112(a). Further, the ADA provides that the term "discriminate" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a

11

disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." § 12112(b)(5)(a).

The Act defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." § 12111(8). In turn, a "disability" is: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." § 12102(2).[4]

A plaintiff who seeks to prove she is disabled under the ADA's definition of disability, subsection (A), must prove that she has a physical or mental impairment. § 12102(2)(A). EEOC regulations define a "physical impairment" as "any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic, skin; and endocrine." 29 C.F.R. § 1630.2(h)(1).[5]

---

[4] "There are two potential sources of guidance for interpreting the terms of this definition – the regulations interpreting the Rehabilitation Act of 1973, 87 Stat. 361, as amended, 29 U.S.C. § 706(8)(B) (1988), and the EEOC regulations interpreting the ADA." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 193 (2002). While the Supreme Court has not decided what deference, if any, is due to implementing regulations issued by the EEOC, it has relied on these regulations in analyzing cases, particularly when neither party to a case challenges their reasonableness. *See, e.g., Sutton v. United Airlines, Inc.*, 527 U.S. 471, 479 (1999). As in *Sutton*, "[b]ecause both parties accept these regulations as valid, and determining their validity is not necessary to decide this case, we have no occasion to consider what deference they are due, if any." *Id.* at 480.

[5] This definition is identical to that contained in the regulations implementing The Rehabilitation Act, a precursor to the ADA that prohibits discrimination on the basis of disability by recipients of federal funds. 45 C.F.R. § 84.3(j)(2)(I) (2001). These regulations are particularly important because Congress relied heavily on The Rehabilitation Act in drafting the ADA and even specified that, "[e]xcept as otherwise provided in this chapter, nothing in

Merely having an impairment, however, does not make one disabled for purposes of the ADA. Plaintiffs also need to demonstrate that the impairment substantially limits a major life activity. *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195 (2002 (citing 42 U.S.C. § 12102(2)(A) (1994)). The ADA's implementing regulations provide a non-exhaustive list of major life activities, including "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(I). Further, the limitation on the major life activity must be "substantial"; to be substantially limited means to be unable to perform a major life activity that the average person in the general population can perform, or to be significantly restricted in the ability to perform it. 29 C.F.R. § 1630.2(j). In determining whether an individual is substantially limited in a major life activity, the EEOC advises that courts should consider: "(I) the nature and severity of the impairment, (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *Id.*

## III. ANALYSIS

In an appeal from a grant of summary judgment, we review the district court's decision de novo. *EEOC. v. R. J. Gallagher Co.*, 181 F.3d 645, 652 (5th Cir. 1999). The party moving for summary judgment bears the burden of identifying the portions of the record that demonstrate the absence of a genuine issue of material fact. *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). The nonmovant must then point to or produce specific facts demonstrating that there is a genuine issue of material fact. *Id.* We construe all facts and inferences

---

this chapter shall be construed to apply a lesser standard than the standards applied under Title V of The Rehabilitation Act of 1973 (29 U.S.C. §§ 790 *et seq.*) or the regulations issued by Federal agencies pursuant to such title." *Williams*, 534 U.S. at 195.

in the light most favorable to the nonmovant, *Blow v. City of San Antonio*, 236 F.3d 293, 296 (5th Cir. 2001), and we will not weigh evidence or evaluate the credibility of witnesses, *Morris v. Covan World Wide Moving*, 144 F.3d 377, 380 (5th Cir. 1998).

When a plaintiff can offer only circumstantial evidence to prove a violation of the ADA, this court applies the *McDonnell Douglas* burden-shifting framework. *See McInnis v. Alamo Comm. College Dist.*, 207 F.3d 276, 279 (5th Cir. 2000). Under this framework the plaintiff must first make a prima facie showing of discrimination, *viz.* that (a) she is disabled, has a record of having a disability, or is regarded as disabled, (b) she is qualified for her job, (c) she was subjected to an adverse employment action on account of her disability or the perception of her disability, and (d) she was replaced by or treated less favorably than non-disabled employees. *Id.* at 279. If the employer can articulate a legitimate non-discriminatory reason for the adverse employment action, the *McDonnell Douglas* burden-shifting framework falls away and the issue becomes discrimination *vel non. Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000).[6] In considering the ultimate issue of discrimination, the trier of fact can consider both the evidence presented in the prima facie case and any evidence the plaintiff produces that tends to show that the employer's articulated reason for the adverse employment action was pretextual. *Id.*

---

[6] *Reeves* is a case concerning the Age Discrimination in Employment Act, 29 U.S.C. §§ 623 *et seq.* The *McDonnell Douglas* framework, however, is used in cases alleging discrimination under many different statutes, and courts regularly employ definitions and standards used in the *McDonnell Douglas* framework under multiple statutes. This circuit has not explicitly applied *Reeves* to a case arising under the ADA, but other circuits have done so. *See, e.g., Marcano-Rivera v. Pueblo Int'l, Inc.*, 232 F.3d 245, 251 (1st Cir. 2000).

<u>Disability</u>

Contrary to the district court, we conclude that based on the summary judgment record a jury could reasonably find that Netterville's CFS caused a substantial limitation on her major life activities of caring for herself, sleeping, and thinking.[7] CPChem does not dispute that these are major life activities.

The ADA's implementing regulations as promulgated by the EEOC specify that caring for oneself is a major life activity. 29 C.F.R. § 1630.2(I). Courts, including this circuit, have explicitly recognized it as such. *See Hamilton v. SW Bell Tel. Co.*, 136 F.3d 1050, 1050 (5th Cir. 1998); *see also Dovenmuehler v. St. Cloud Hosp.*, 509 F.3d 435, 440 (8th Cir. 2007); *Greenberg v. BellSouth Telecomms.*, 498 F.3d 1258, 1264 (11th Cir. 2007); *Holt v. Grand Lake Mental Health Ctr.*, 443 F.3d 762, 767 (10th Cir. 2006); *Reg'l Econ. Cmty. Action Program v. City of Middletown*, 294 F.3d 35, 47 (2d Cir. 2002).

Every circuit that has addressed the issue has concluded that sleeping is a major life activity. *See, e.g., Desmond v. Mukasey*, 530 F.3d 944, 953 (D.C. Cir. 2008); *Nadler v. Harvey*, No. 06-12692, 2007 WL 2404705, at *5 (11th Cir. Aug. 24, 2007) (unpublished); *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 755 (7th Cir. 2006); *Boerst v. Gen. Mills Operations, Inc.*, 25 F. App'x 403 (6th Cir. 2002) (unpublished); *EEOC v. Sara Lee Corp.*, 237 F.3d 349, 352-53 (4th Cir. 2001); *Pack v. Kmart Corp.*, 166 F.3d 1300, 1305 (10th Cir. 1999); *McAlindin v. County of San Diego*, 192 F.3d 1226, 1234 (9th Cir. 1999); *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 643 (2d Cir. 1998). In a recent opinion the D.C. Circuit performed a thorough analysis of why sleep is a major life activity,

---

[7] It is undisputed that Netterville was qualified for her job, and none of the evidence tends to show otherwise. A qualified individual with a disability, under the ADA, is one who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Netterville received satisfactory job reviews shortly before her termination, and CPChem does not argue that she was unable to perform her job duties or that she was discharged for performance-based reasons.

relying on scientific evidence that the average person spends about one-third of her life asleep and that sleep plays an important role in brain development, memory reinforcement, and immune function. *Desmond*, 530 F.3d at 953.

The EEOC compliance manual provides that "[m]ental and emotional processes such as thinking, concentrating, and interacting with others are other examples of major life activities." EEOC Compliance Manual, § 902.3(b) (2008), *available at* http://www.eeoc.gov/policy/docs/902cm.html. Most circuits that have addressed the question have concluded that thinking is a major life activity in and of itself. *See, e.g.*, *Battle v. United Parcel Serv., Inc.* 438 F.3d 856, 861 (8th Cir. 2006) ("[T]hinking and concentrating qualify as 'major life activities' under the ADA."); *Head v. Glacier N'west*, 413 F.3d 1053, 1061 (9th Cir. 2005); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 307 (3d Cir. 1999). No circuit appears to have concluded that thinking itself is not a major life activity.[8]

We conclude that sleeping and thinking are major life activities. This is consistent with the Supreme Court's guidance on major life activities, which indicates that major life activities are "those activities that are of central importance to daily life." *Williams*, 534 U.S. at 197; *see also Jenkins v. Cleco Power LLC*, 487 F.3d 309, 315 (5th Cir. 2007). Thinking and sleeping are certainly of central importance to daily life.

In our view, the record in this case supports a reasonable inference that Netterville was substantially limited in the three major life activities of thinking, sleeping and caring for herself when CPChem discharged her.

---

[8] A few circuits have held that concentration, which could be considered an aspect of thinking, is better understood as part of other life activities like working or learning. *See, e.g. Pack*, 166 F.3d at 1305 ("Concentration may be a significant and necessary component of a major life activity, such as working, learning, or speaking, but it is not an 'activity' itself."); *Moysis v. DTG Datanet*, 278 F.3d 819, 825 (8th Cir. 2002) ("'[T]he need for routine,' as well as 'memory, concentration, and interacting with others [are] activities that feed into the major life activities of learning and working.'")(internal citations omitted).

Netterville submitted sufficient evidence to survive summary judgment on the question of whether she was substantially limited in the major life activity of caring for herself. Netterville's affidavit attests that she often did not shower for several days because contact with the water was painful and because her arms hurt too much to raise them to wash herself or dry her hair. When she did shower, she needed to rest afterwards. She was unable to cook, shop for food, zip up her own clothes, or even use the bathroom without her sister's assistance. These are the kinds of activities involved in caring for oneself that average people can perform with ease and that the Supreme Court has specifically identified as elements of "caring for oneself" under the ADA. *See Williams*, 534 U.S. at 201 ("[H]ousehold chores, bathing, and brushing one's teeth are among the types of manual tasks of central importance to people's daily lives . . . . "). Netterville's inability to complete these tasks by herself or in the amount of time an average person would require supports a reasonable inference that she was substantially limited in caring for herself. *See Fenney v. Dakota, Minnesota & E. R. Co.*, 327 F.3d 707, 715 (8th Cir. 2003) (finding that plaintiff who testified that "it takes him twice as long as an average person to perform his 'taking care of himself' tasks – bathing, shaving, preparing a meal, dressing, and going to the restroom" had presented enough evidence to survive summary judgment on the question of whether he was substantially limited in the major life activity of caring for himself); *EEOC v. United Parcel Serv.*, 249 F.3d 557, 562-63 (6th Cir. 2001) (holding that a reasonable jury could find that plaintiff who suffered severe allergies that forced him to spend all of his non-working hours in bed and required his wife to assume his household duties was substantially limited in the major life activity of caring for himself).

With respect to sleeping, Netterville testified that after her CFS symptoms recurred in June or July of 2002, for two weeks of every month she got no more than one or two hours of sleep a night for six or seven days in a row, and then

three or four hours of sleep a night on the remaining days, often waking up every hour. Once a month she would sleep for up to seventeen hours at a time. During the day she was often so tired that she fell asleep while driving, needed to rest during lunch, and experienced fatigue and brain fog. This evidence is sufficient for a jury to reasonably find that Netterville was substantially limited in her sleep as compared to the average person in the population and that the lack of sleep affected her waking hours. *See, e.g., Desmond*, 530 F.3d at 956 (finding that plaintiff who claimed to sleep only two to four hours a night had put forth enough evidence of sleep disturbance to survive summary judgment); *McAlindin*, 192 F.3d at 1235 (finding that where plaintiff testified that he had "great difficulty" sleeping, was sometimes unable to sleep, and took medications that disrupted his normal sleep patterns and caused drowsiness at work, he had produced enough evidence to survive summary judgment).

With respect to thinking, Netterville testified that she suffered from episodes of aphasia, including times when she forgot her own son's name, an inability to concentrate, forgetfulness about how to perform routine tasks, and falling asleep or losing focus while driving. This testimony is sufficient to support a finding that Netterville's CFS created a substantial limitation on Netterville's ability to think relative to the average person. *See, e.g., Head*, 413 F.3d at 1061 (finding that plaintiff had produced enough evidence of a substantial limitation on the major life activity of thinking to preclude summary judgment where he had testified that his bipolar disorder/depression affected his short-term memory and ability to concentrate, that he could not stay focused on anything for more than brief periods of time, and that he had to be repeatedly reminded of tasks and appointments).

The magistrate judge, citing no authority, found that none of Netterville's impairments rendered her disabled because her CFS was "intermittent" and because her impairments were "short-lived, non-permanent, and non-severe."

18

Two kinds of error are palpable in the magistrate judge's ruling. First, the court misunderstood and misapplied the legal standards under the ADA for determining the duration, permanency, and severity of a condition like CFS. Second, the magistrate judge failed to draw the required reasonable inferences from the record in Netterville's favor that support finding that she had an ADA disability from the summer of 2002 through and after her discharge on February 27, 2003.

In an ADA case, the relevant time for assessing the existence of a disability is the time of the adverse employment action. *See Samuels v. Kansas City Mo. Sch. Dist*, 437 F.3d 797, 802 (8th Cir. 2006); *Swanson v. Univ. of Cincinnati*, 268 F.3d 307, 316 (6th Cir. 2001); *Cash v. Smith*, 231 F.3d 1301, 1306 (11th Cir. 2000). In the present case, the crucial question is whether Netterville was suffering an ADA disability at the time of her discharge on February 27, 2003. Applying the appropriate ADA and summary judgment standards, the record reflects that Netterville's CFS symptoms began to manifest themselves in June or July of 2002, continued through and after her discharge on February 27, 2003, and were of sufficient severity and of expected duration to constitute an ADA disability throughout this entire period. Thus, contrary to the magistrate judge's understanding, Netterville's disability was not "intermittent," "short-lived" or "non-permanent."

Moreover, the fact that the expected duration of an individual's disability is indefinite does not necessarily defeat her action under the ADA. The ADA's implementing regulations provide for consideration of the "duration or expected duration of the impairment" and the "permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment" in evaluating whether an impairment is substantially limiting. 29 C.F.R. § 1630.2(j)(2). The EEOC Compliance Manual indicates that an impairment that substantially limits or is expected to substantially limit a major life activity and

whose "duration is indefinite and unknowable or is expected to be at least several months" qualifies as a disability under the ADA. Duration and Impact of Impairment, EEOC Compliance Manual (2007) § 902.4(d), *available at* http://www.eeoc.gov/policy/docs/902cm.hmtl.

Many courts have recognized that relapsing-remitting conditions like multiple sclerosis, epilepsy, or colitis can constitute ADA disabilities depending on the nature of each individual case. *See, e.g., Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 780 (6th Cir. 1998) (finding that plaintiff who suffered flare-ups of pustular psoriasis eight years apart was disabled under the ADA because "[i]t is not necessary that she experience flare-ups on a daily basis . . . [plaintiff's] case of psoriasis is a physical impairment because of the ongoing nature of the disease and its physiological impact even during its dormant stage"); *Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 544 (7th Cir. 1995) ("[A]n intermittent impairment that is a characteristic manifestation of an admitted disability is, we believe, a part of the underlying disability and hence a condition that the employer must reasonably accommodate. Often the disabling aspect of a disability is, precisely, an intermittent manifestation of the disability, rather than the underlying impairment."); *cf. Ryan v. Grae & Rybicki*, 135 F.3d 867, 871-72 (2d Cir. 1998) (noting that because the determination of whether an impairment substantially limits a major life activity within the meaning of ADA is fact-specific, a court of appeals' decision that a particular employee's colitis did not present a prima facie case of a substantial limitation on her ability to care for herself did not mean that colitis could never impose such a limitation under the specific facts of other cases).

In contrast, "temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities." 29 C.F.R. § 1630.2(j); *Pryor v. Trane Co.*, 138 F.3d 1024, 1026 (5th Cir. 1998) (same). Examples of temporary, non-disabling impairments include: "broken

limbs, sprained joints, concussions, appendicitis, and influenza." 29 C.F.R. § 1630 app., § 1630.2(j); *see Evans v. City of Dallas*, 861 F.2d 846, 852 (5th Cir. 1988) (considering claim that knee surgery constituted a disability under The Rehabilitation Act).

The consensus of the medical community is that CFS is a chronic disease of indefinite duration for which there is no known cure, since its etiology is not understood. CDC, CFS Basic Facts *available at* http://www.cdc.gov/cfs/cfsbasicfacts.htm (observing that there is no known cure for CFS, and that recovery rates for CFS are "unclear," with improvement rates varying from 8% to 63%, and full recovery "rate" of an average of "only 5% to 10% sustaining total remission"). The chronic nature of CFS is thus much more akin to conditions like epilepsy and MS than it is to a broken leg or the flu.

Further, contrary to the magistrate judge's view, Netterville's ability to perform her job while experiencing her CFS symptoms has no bearing on the determination of whether she was disabled under the ADA. As the Supreme Court has noted in the context of evaluating whether a limitation is substantial, an impairment does not have to be completely disabling to qualify under the ADA because the statute "addresses substantial limitations on major life activities, not utter inabilities" and "the definition is met even if the difficulties are not insurmountable." *Bragdon v. Abbott*, 524 U.S. 624, 641 (1998) (holding that plaintiff with HIV was significantly limited in the major life activity of reproduction even though it was still potentially possible for her to reproduce); *see also Emory v. AstraZeneca Pharm., LP*, 401 F.3d 174, 181 (3d Cir. 2005) ("What a plaintiff confronts, not overcomes, is the measure of substantial limitation under the ADA."). Moreover, the assessment of whether an individual is disabled is made not just with respect to the workplace, but also by looking at the effect of the impairment on the individual's entire life. *See Williams*, 534 U.S. at 201. Considering plaintiffs' abilities to perform their jobs as evidence

weighing against finding that they are disabled under the ADA would create an impossible catch-22 for plaintiffs: if their disabilities prevented them from doing their jobs altogether they would not be qualified individuals for the job under the ADA, and if they were able to work through their disabilities they would then not be considered disabled. *See, e.g., Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 24 (1st Cir. 2002) (declining to adopt rule that would impose "an unenviable 'catch-22:' in order to demonstrate that she is disabled, the plaintiff would also have to demonstrate why she is unqualified to do the job to which she aspires").

Finally, the magistrate judge erroneously based her finding that Netterville was not disabled on the fact that her CFS symptoms were ultimately somewhat responsive to and partially controlled by the sleep and anti-depressant medications prescribed by her physician. Individuals who take medication or use corrective devices to lessen an impairment but still remain substantially limited as to one or more major life activities are still disabled under the ADA. *See e.g., Otting v. J.C. Penney Co.*, 223 F.3d 704, 710 (8th Cir. 2000) (finding that individual with epilepsy who was still having disabling seizures several times a month at the time of her termination despite medication and surgery was disabled under the ADA); *Bartlett v. N.Y. State Bd. of Law Exam'rs*, 226 F.3d 69, 80-81 (2d Cir. 2000) (finding that plaintiff with learning disability whose self-accommodations improved her ability to read could still be disabled under the ADA if her difficulties amounted to a substantial limitation compared to most people's abilities to read); *see also Sutton v. United Air Lines*, 527 U.S. 471, 488 (1999) ("The use or nonuse of a corrective device does not determine whether an individual is disabled; that determination depends on whether the limitations an individual with an impairment actually faces are in fact substantially limiting."); *see also MX Group, Inc. v. City of Covington*, 293 F.3d 326, 339 (6th Cir. 2002) (holding that fact that methadone treatment

ameliorated drug addiction as it was meant to did not deprive recovering drug addicts of the ADA's protection).

The question of whether an individual is disabled under the ADA thus remains an individualized inquiry, and in this case a jury reasonably could find that Netterville was disabled under the statute because she was substantially limited in the major life activities of caring for herself, sleeping, and thinking. Netterville testified that, at the time she returned to work from her two weeks leave, on February 21, 2003, she was still – despite her regimen of medications – suffering from numbness in her legs and pain in her hands, difficulty concentrating, and fatigue. She explained that her continuing impairments were why she requested the accommodations of first working in a substation closer to home – so that she would have less distance to drive, since she was often falling asleep at the wheel – and, second, alternating reading and typing and resting during her lunch break, since she was suffering from fatigue during the day, pain in her hands, and problems with her concentration. In her post-deposition affidavit, Netterville stated that at the time of her termination she was suffering from severe headaches, low-grade fevers that interfered with her sleep, sensitivity to light, pain in her legs, disturbances in her vision, difficulty staying awake at the wheel, and morning nausea that made it difficult to get up and get dressed. She further stated that she was living with her sister at the time of her termination because she still needed help with the daily tasks of caring for herself. Although Netterville's symptoms improved somewhat on the correct regimen of medication, a jury reasonably could find that she was still substantially limited in the major life activities of caring for herself, sleeping, and thinking, and thus still disabled under the ADA at the time she was discharged. *See e.g., Otting,* 223 F.3d at 710.

Accommodation

On appeal the EEOC argues that there is a triable issue as to whether CPChem violated the ADA by refusing to grant Netterville reasonable accommodations for her disability.[9] EEOC regulations promulgated to implement the ADA define "reasonable accommodation" as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). An employee who needs an accommodation because of a disability has the responsibility of informing her employer. *Taylor v. Principal Fin. Group*, 93 F.3d 155, 165 (5th Cir. 1996). The employee must explain that the adjustment in working conditions or duties she is seeking is for a medical condition-related reason, but the employee does not have to mention the ADA or use the phrase "reasonable accommodation." Plain English will suffice. *See* EEOC "Requesting Reasonable Accommodation" *in* Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the ADA (Oct. 17, 2002), *available at* http://www.eeoc.gov/policy/docs/accommodation.html.

This court has recognized that "where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, the initial burden rests primarily upon the employee . . . to specifically identify the disability and resulting limitations, and to suggest the

---

[9] The parties debate whether requesting an accommodation is a protected activity if the employee is later determined not to have a disability under the ADA. Every appeals court to consider this issue has concluded that it is protected as long as the employee had the reasonable belief that he was covered by the ADA. *See, e.g., Bryson v. Regis Corp.*, 498 F.3d 561, 577 (6th Cir. 2007); *Freadman v. Metro Prop. & Cas. Ins. Co.*, 484 F.3d 91, 106 (1st Cir. 2007); *Cassimy v. Bd. of Educ.*, 461 F.3d 932, 938 (7th Cir. 2006); *Heisler v. Metro Council*, 339 F.3d 622, 632 (8th Cir. 2003); *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1328 (10th Cir. 1998); *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 502 (3d Cir. 1997). Because a jury reasonably could find that Netterville was disabled under the ADA, as explained previously, and that CPChem's proffered reason for firing Netterville was pretextual, we need not reach this issue.

reasonable accommodations." *Taylor*, 93 F.3d at 165. Once an employee makes such a request, however, the employer is obligated by law to engage in an "interactive process": "a meaningful dialogue with the employee to find the best means of accommodating that disability." *Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 108 (1st Cir. 2005). The process thus requires "communication and good-faith exploration." *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 871 (6th Cir. 2007). When an employer does not engage in a good faith interactive process, that employer violates the ADA – including when the employer discharges the employee instead of considering the requested accommodations. *Cutrera v. Bd. of Supervisors of La. St. Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) ("An employer may not stymie the interactive process of identifying a reasonable accommodation for an employee's disability by preemptively terminating the employee before an accommodation can be considered or recommended.").

The EEOC argues that Netterville requested reasonable accommodations from CPChem twice: when she first attempted to return to work with Dr. Salvato's first release note, and then again when she presented Thurman with Dr. Salvato's second release note. The magistrate judge found that the first note from Dr. Salvato was not a request for accommodation because it did not identify a location closer to Netterville's home at which Netterville could work and did not specify the medical condition involved. A jury, however, reasonably could find that, since CPChem knew that Netterville had required medical leave due to her CFS, it knew that the release related to this condition, and that she therefore had adequately communicated the nature of her condition and her requested accommodations. Further, Netterville was not required to come up with the solution (*i.e.*, a CPChem location closer to home) on her own. Under the ADA, once the employee presents a request for an accommodation, the employer is required to engage in the interactive process so that *together* they can

determine what reasonable accommodations might be available. *See, e.g., Cutrera*, 429 F.3d at 113.

From this evidence a jury reasonably could find that CPChem did not attempt to entertain the requested accommodation: Borths and Rugeley testified they were not sure if a vacancy existed elsewhere and that they made no effort to consider the request because Netterville had not specified her medical condition and had not identified an alternate location. Further, Netterville testified that she attempted to discuss the terms of her release with Thurman to clarify her needs, but Thurman refused to discuss it with her, saying "No. We just can't take this. This isn't going to work." Finally, the record reflects that at the meeting at which Netterville was suspended, Thurman and Rugeley asked her about her CFS and the medical questionnaire but did not discuss any accommodations with her. Thus a jury reasonably could find that CPChem, instead of engaging in the interactive process that the ADA requires, simply refused to consider Netterville's request for accommodation.

The magistrate judge concluded that a jury reasonably could find that Dr. Salvato's second note, requesting lunchtime rest and alternation of typing and reading, qualified as an accommodation request. The magistrate judge also decided, however, that a reasonable jury must find that CPChem had granted those accommodations. But Netterville testified that when she gave Thurman the second release he remained silent and made no comment on the requested accommodations. Thus based on Netterville's testimony a jury reasonably could find that CPChem refused her the requested accommodations and/or fired her without giving them any consideration.

Discharge

The ADA provides that no covered entity shall "discriminate" against a qualified individual with a disability because of the disability of such individual

26

in regard to, *inter alia*, "the hiring, advancement, or discharge of employees . . . and other terms conditions, and privileges of employment." 42 U.S.C. § 12112(a). The EEOC contends that CPChem violated the ADA by discharging Netterville for having a disability and requesting an accommodation. CPChem argues, and the magistrate judge held, that the only reasonable inference from the evidence is that CPChem fired Netterville for misrepresenting her medical history. CPChem correctly notes that misrepresentations on employee documents can be a legitimate, nondiscriminatory reason for an adverse employment decision, like declining to hire or firing an employee. *See, e.g., Avant v. S. Cent. Bell Tel. Co.*, 716 F.2d 1083, 1086-87 (5th Cir. 1983). However, a jury reasonably could find that Netterville answered the questions on the questionnaire truthfully and that CPChem's proffered explanation was not credible in light of all of the evidence.

First, the questionnaire did not ask about CFS, about any condition related to CFS, or use language that a layperson would necessarily have thought referred to CFS. Netterville offered plausible explanations for her responses on the questionnaire. Given the lack of any medical evidence or authority characterizing CFS as "anemia" or any "other blood condition," a jury reasonably could find that Netterville truthfully answered this question and that CPChem either knew or should have known that she did so. In reference to the question about excessive fatigue associated with work or exercise, Netterville testified that the CFS symptoms she experienced in 1987 while unemployed were not associated with work or exercise. Thus a jury reasonably could find that Netterville truthfully answered this question as well. Further, as Netterville noted in her affidavit, she truthfully answered "yes" to a wide range of other medical conditions, any of which, for all she knew, could have been a reason for CPChem to refuse to hire her as a full-time employee; a jury reasonably could

infer from these honest responses that she answered the questionnaire truthfully and did not attempt to hide anything about her medical history.

CPChem relies heavily on the fact that during her first conversation with Thurman about her need for medical leave Netterville responded to a question about the onset of her recurrence by saying "I don't know. Two years?" (Two years prior to the conversation would place the recurrence date before she filled out the questionnaire). Netterville testified, however, that she realized as soon as she returned to her desk after the conversation that she had misspoken, and that her symptoms had returned only the previous summer, well after she had filled out the questionnaire and been permanently hired. She also testified that she attempted to clear up this misunderstanding in the meeting she later had with Thurman and Rugeley, and Thurman's email in the record reflects that after that meeting she returned to tell Thurman once again that her CFS had been diagnosed "much later" than two years prior to her conversation with him.

Second, CPChem argues – and the magistrate judge found – that Netterville admitted to misrepresenting her medical history on the questionnaire. There is a genuine issue as to the material fact of such admission, however, making summary judgment improper on this ground. When questioned about the meeting between Netterville, Rugeley, and Thurman, Netterville explained that she told Rugeley and Thurman that the questionnaire did not bring her CFS to mind because "I hadn't had symptoms for 15 years. I honestly really felt that I did not have it to begin with . . . I had really convinced myself I never had it." Further, Netterville argues, and a jury reasonably could find, that she did not write it down because the questionnaire did not ask about CFS or any general non-exercise or non-work related fatigue, nor did it have any catch-all provision that would elicit responses about medical issues not addressed by the questions. In this respect the questionnaire only asked whether she had experienced excessive fatigue with work or exercise. Netterville testified

that her 1987 CFS occurred while she was unemployed and that it was not related to work or exercise. Thurman and Rugeley, on the other hand, testified that Netterville said she did not mention her 1987 CFS on the questionnaire because she did not think it would affect her work. Thus there is a genuine issue as to the material fact of the content of Netterville's statements that precludes summary judgment on this question.

Contrary to CPChem's arguments, a jury reasonably could find that CPChem's management immediately reacted to Netterville's announcement of her CFS recurrence and need for medical leave by looking for reasons to fire her because of her disability or request for accommodations, or both. When Rugeley found out from Thurman that Netterville had CFS and had requested two weeks off, Rugeley's immediate response was to get in touch with the medical department about her questionnaire and investigate what answers she had given and whether, if any were false, she could be terminated for that reason. CPChem argues that this was standard procedure in CPChem's workplace, but a jury reasonably could find otherwise. Pete Borths, director of labor relations for CPChem and its corporate predecessor, testified in his deposition that CPChem often used progressive discipline for offenses like verbal altercations, sleeping on the job, tardiness, absenteeism, failure to wear personal protective equipment, etc. The common progression was from verbal warning, to written warning, to a final warning before termination, and Borths testified that he would take into account the time between events as well as other factors.

According to Borths, fighting, stealing and falsification of information could result in immediate termination, but only two other employees had been fired at his direction for falsification. One had stolen money from the company by claiming to have lost a paycheck that he in fact had cashed, and from which he retained the proceeds. The other had admitted to falsifying the pre-employment medical questionnaire by deliberately omitting a medical condition

she knew she had for the specific purpose of knowingly misleading CPChem into hiring her because she believed that disclosing the condition would make it impossible to get the job. Each of these offenses was an outright dishonest act and doubtlessly was the sole animating reason that the employer decided to terminate the employee immediately. In the present case, however, a jury reasonably could find that Netterville's much less serious errors or omissions, if any, were used merely as a pretext by CPChem to terminate her because the real reason for its adverse employment action was her disability or her request for accommodations, or both. Overall, in light of all the evidence, a jury reasonably could infer that CPChem's decision to fire Netterville immediately was not based on its standard procedure but was based on Netterville's disability and accommodations requests, and that CPChem's explanation for the termination is thus not credible.

Finally, a jury reasonably could find that CPChem's shifting story as to what exactly CPChem claimed was misrepresented on the questionnaire evidences a desire to discharge Netterville however possible and casts doubt on the proffered explanation. *See Gee v. Principi*, 289 F.3d 342, 347-48 (5th Cir. 2002). CPChem asserts on appeal that Borths reviewed the questionnaire and determined that Netterville should have responded "yes" to the excessive fatigue question, but the record contains no evidence to support this proposition. The correspondence in the record between Netterville's supervisors and CPChem's medical personnel indicates only Nurse Zamboras' erroneous assumption that CFS was a blood disorder that required Netterville to answer "yes" to the question asking about "anemia or other blood condition/blood transfusion" on the questionnaire. CPChem argues that Netterville should also have answered "yes" to the question about "excessive fatigue with work or exercise," but a jury reasonably could find that this rationale developed only after CPChem had already decided to discharge Netterville or even after she had been discharged.

Further, when Rugeley and Thurman met with Netterville upon her return to work neither of them had the questionnaire with them and both admitted they had never even seen it. According to their testimony the meeting focused only on the information they believed would allow them to discharge Netterville: namely when her symptoms returned, what she could recall that she had written on the questionnaire, and what she had told Thurman about her questionnaire answers. Neither of them appear to have made any attempt to check the accuracy of Nurse Zamboras' incorrect assumption that CFS is a blood disorder, either by following up with Dr. Salvato or by any other means, despite the fact that Netterville had given them published information about CFS that did not contain any suggestion that it was a blood disorder. Consequently, a jury reasonably could find that CPChem's management first formed an intention to discharge Netterville because of her CFS disability or accommodations requests and only afterwards developed the purely pretextual reasons they advanced for their actions.

## IV. CONCLUSION

For these reasons, we conclude that the EEOC has raised genuine questions of material fact regarding whether Netterville was disabled under the ADA at the time of her discharge, whether CPChem failed to accommodate her known substantial limitations, and whether CPChem discharged her because of her CFS disability and requests for accommodations. The summary judgment of the district court is therefore REVERSED and the case is REMANDED for further proceedings consistent with this opinion.