# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
July 15, 2022

Lyle W. Cayce
Clerk

No. 21-50132

Jennifer J. Harkey,

*Plaintiff—Appellant*,

*versus*

NextGen Healthcare, Incorporated,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Western District of Texas
USDC 6:19-CV-590

Before Elrod, Southwick, and Costa, *Circuit Judges*.

Per Curiam:[*]

Jennifer Harkey had an unfortunate encounter with a male co-worker while she was sleepwalking. She was fired. Harkey then sued her former employer, NextGen Healthcare, under the Americans with Disabilities Act and the Texas Commission on Human Rights Act. The district court granted summary judgment to NextGen. We AFFIRM.

---

[*] Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

No. 21-50132

I.

NextGen hired Jennifer Harkey in March 2008 as an "Implementation Specialist."[**]  She worked without incident for over a decade.  In September 2018, she was promoted to the position of "Sales Specialist," effective November 1, 2018.

On the evening of October 10, 2018, Harkey was attending an out-of-town national sales conference for NextGen at a large hotel in St. Louis, Missouri.  After a dinner and a few drinks with a female co-worker, Harkey headed up to her room.  She then watched some television and fell asleep.

Around midnight, another employee of NextGen who was also attending the conference, Scott O'Donnell, had just returned to his room from the hotel bar when he heard a knock at the door.  Rather than peering through the peephole, assuming it was one of the other men who he had just been at the hotel bar with, he opened the door.  There stood Harkey, whom he did not recognize.  Harkey says that she was wearing a "black cotton robe" that fell to her knees and that she was naked under the robe.

O'Donnell was startled and stepped backwards.  Harkey entered the room without looking at O'Donnell.  O'Donnell said something along the lines of "I think you're in the wrong room.  What are you doing here?  You need to get out" and remembers repeating "You're in the wrong room."  Harkey said nothing, walked over to a made bed and got in it, then pulled the sheets all the way up to her face.  According to O'Donnell, "She just laid there, didn't move and was nonresponsive to me asking her to leave and telling her she was in the wrong room."  Harkey did not touch O'Donnell

---

[**] At this stage, the facts are viewed in the light most favorable to Harkey.  *See Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002).

during the incident.     Moreover, O'Donnell states that she never propositioned him or sexually harassed him.

Still, O'Donnell was concerned.  He was a married man on an out-of-town business trip, and a woman was in a bed in his hotel room.  He called his supervisor, Sean Murtagh, to the room.  Murtagh also did not recognize Harkey as a NextGen employee.  Murtagh decided to contact Jill Burke, the director of Human Resources at NextGen, who was also attending the conference.  When Burke arrived, she attempted to wake Harkey repeatedly.  Burke pulled back the covers and Murtagh snapped a picture of her.  Burke was able to waken Harkey, but Harkey was disoriented.  Burke also described Harkey as "smell[ing] of alcohol" and "exposing skin."  Although he was further away, Murtagh testified that he did not smell alcohol and that her robe fully covered her, so that no "personal part[s]" were exposed.

Eventually, hotel security was called, and it was determined that Harkey's room was next door to O'Donnell's.  According to Burke's notes, which she discussed during her deposition, as security helped get Harkey back to her room, Harkey was "very apologetic" and embarrassed.  According to Burke, Harkey stated that she must have been sleepwalking, which she had done from time to time when she was a child.  Burke's notes also recall that Harkey said that she "wasn't assaulted or anything" in the hotel room, that she was fine, and that she was "so sorry."  O'Donnell went back into his room, gathered his stuff, and moved to a different hotel room.

O'Donnell was asked to write an e-mail about what happened.  At that point, he was extremely uncomfortable "because of the accusatory-sounding questions that [Burke] had asked [him] earlier in the night about what happened."  Because of his discomfort at that line of questioning, he mentioned wanting to speak with a lawyer before writing an e-mail about the incident.  He later testified about his concern with how his wife would react

to learning about the situation and, more generally, about how it might be interpreted in the "Me Too" era.

The next morning, Harkey went downstairs for breakfast and business meetings. At some point in the morning, she was asked to go up to a conference room where she saw Burke sitting alone at a long conference table. Harkey said she had "a flashback" and remembered her face from the night before. Burke told Harkey to sit down and that she "was in very big trouble," "needed to be concerned," and that Burke wanted to discuss last night. Harkey told her about the evening, as she could recall it. Harkey told her she had sleepwalked throughout her childhood but that it rarely happens. She was also asked about what she was wearing. Harkey stated that she felt from the beginning of the conversation that Burke had made her mind up about what had happened. Burke told her to pack her bags and that she was suspended on paid leave. Multiple times in the conversation, Burke called Harkey a "liability." Burke told Harkey to "call a doctor," and Harkey said she would quickly do so.

Harkey called her doctor for a referral as she was waiting for her flight home and began the process for making an appointment with a diagnostician, Dr. Sudan. Harkey sent an e-mail to Burke on October 12, 2018 (the day after the incident), informing her of the medical updates and assuring her that she was taking the situation seriously. On October 16, Harkey sent an e-mail updating Burke that she had been able to get an appointment with Dr. Sudan for the following week. Later the same day that she sent that e-mail, on October 16, Harkey was terminated.

When Harkey was able to see her doctor, he diagnosed her condition as somnambulism, otherwise known as "sleep walking disorder." On September 4, 2019, Harkey brought a lawsuit in state court alleging that she

was fired on account of a disability. It was removed to federal court, with the operative complaint alleging violations of the ADA and the TCHRA.

The district court granted summary judgment for NextGen. The district court concluded that Harkey could not establish a *prima facie* showing of disability discrimination because she "fail[ed] to meet the requirements of proving a disability" and that "she fail[ed] to show evidence that she was subject to an adverse employment decision because of her sleepwalking." The district court further held that NextGen fired Harkey for "misconduct"—a legitimate, nondiscriminatory reason—and that Harkey could not demonstrate that this was pretext.

## II.

We review a district court's grant of summary judgment *de novo*. *Kitchen v. BASF*, 952 F.3d 247, 252 (5th Cir. 2020). Summary judgment is appropriate where the movant demonstrates "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a summary-judgment motion, we draw all reasonable inferences in the light most favorable to the nonmoving party. *See Calbillo*, 288 F.3d at 725; *Anderson*, 477 U.S. at 255. The district court may not "weigh the evidence or evaluate the credibility of witnesses." *Johnson v. Diversicare Afton Oaks*, 597 F.3d 673, 676 (5th Cir. 2010); *E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 615 (5th Cir. 2009).

The ADA prohibits an employer from discriminating against a qualified individual with a disability "on the basis of that disability." 42 U.S.C. § 12112(a). Likewise, the TCHRA prohibits employers from discriminating "because of . . . disability." Tex. Lab. Code § 21.051. Texas

courts "look[] to analogous federal precedent for guidance when interpreting the [TCHRA]." *NME Hosps., Inc. v. Rennels*, 994 S.W.2d 142, 144 (Tex. 1999). Thus, we consider ADA and TCHRA claims alike and analyze them the same way. *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 340 n.2 (5th Cir. 2019).

For discriminatory-termination claims, the employee may either (1) "present direct evidence that she was discriminated against because of her disability," or (2) "proceed under the burden-shifting analysis first articulated in" *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014). Harkey did not present direct evidence of discrimination, so she must rely on the burden-shifting analysis under *McDonnell Douglas*.

The *McDonnell Douglas* analysis "first requires the [plaintiff] to establish a prima facie case of discrimination." *Id.* (citing *Chevron Phillips Chem. Co.*, 570 F.3d at 615). To get past this first step, "a plaintiff must prove: (1) that [s]he has a disability; (2) that [s]he was qualified for the job; [and] (3) that [s]he was subject to an adverse employment decision on account of [her] disability." *Id.* at 697; *see also Cannon v. Jacobs Field Servs. N. Am., Inc.*, 813 F.3d 586, 590 (5th Cir. 2016). No one questions that Harkey was qualified, so the disagreement is over the first and third prongs. We address only the third.

## III.

The dispositive question here is whether Harkey suffered an adverse employment action *because of* her disability. She did not. Even if her sleepwalking disorder was a "disability" under the ADA, she was fired because of what happened when she sleepwalked. A few of our cases elucidate the line between the two.

First and foremost is *Hamilton*. There, we held that an employer was not liable for firing a man with PTSD who had an angry and profane

confrontation with his manager even though the episode was arguably caused by his condition. *Hamilton v. Sw. Bell Tel. Co.*, 136 F.3d 1047, 1052–53 (5th Cir. 1998). Though his outburst was arguably caused by his PTSD, it also violated company policy. *Id.* at 1053. We went on to say that "the ADA does not insulate emotional or violent outbursts blamed on an impairment." *Id.*

Another is *Seaman*. That case involved an employee verbally abusing his supervisor for denying his vacation request. *Seaman v. CSPH, Inc.*, 179 F.3d 297, 298–99 (5th Cir. 1999). The employee suffered from bipolar disorder, and when he was fired for insubordination, he sued. *Id.* at 298–99. In affirming summary judgment, we said that though the employee's reaction could have been attributed to his bipolar disorder, he could "not use the ADA as an aegis and thus avoid accountability for his own actions." *Id.* at 301.

That principle applies here. Start with NextGen's reason for firing Harkey: She entered a male co-worker's room just after midnight, uninvited and wearing only a robe, and got into his bed. Set aside any peripheral explanations for her actions, NextGen now had a situation on its hands. A male employee had an unconscious-but-somehow-active female in his hotel room, under the covers in his bed, while he was on a work trip.

In that light, NextGen had to make a decision. That Harkey's "severe, unprofessional, [and] inappropriate" conduct was purportedly caused by her sleepwalking disorder is of no matter. The ADA does not give employees license to act with impunity. *See Seaman*, 179 F.3d at 300–01; *Hamilton*, 136 F.3d at 1052. When Harkey sleepwalked into her male co-worker's room in the state that she was in, NextGen had a reason to fire her. So the ADA is no barrier to her termination.

\*    \*    \*

Harkey has not shown she was fired because she had a sleepwalking disorder. She was fired because of what she did when she was sleepwalking.

No. 21-50132

Because Harkey has failed to establish a *prima facie* case under the ADA (and by extension, the TCHRA), we AFFIRM.