**Reversed and Remanded and Opinion filed June 15, 2023.**



In The

# Fourteenth Court of Appeals

## NO. 14-21-00125-CV

### DONNA HARMON, Appellant

### V.

### TEXAS SOUTHERN UNIVERSITY, Appellee

**On Appeal from the 270th District Court
Harris County, Texas
Trial Court Cause No. 2020-27180**

## O P I N I O N

Donna Harmon appeals from the trial court's dismissal for want of jurisdiction of her employment discrimination lawsuit against Texas Southern University, in which she alleged that TSU failed to provide her with a reasonable accommodation. In two issues, Harmon contends that the trial court erred in granting TSU's plea to the jurisdiction and in refusing to allow additional discovery prior to ruling on the plea. We reverse and remand.

## *Background*

Harmon worked for TSU as a visiting instructor in the English Department. Although her employment was based on a series of one-year appointments, at the time of her termination in December 2018, Harmon had worked for TSU for around sixteen years. As documented by both sides in the lawsuit, Harmon had a history of conflict with the person who was the chair of the TSU English Department at the time of Harmon's termination, Michael Sollars, including one instance in which Sollars summoned campus police to a meeting he was having with Harmon.

Harmon also had a history of trouble with her right knee. Harmon alleged in her declaration in response to the plea to the jurisdiction that she had begun experiencing symptoms of degenerative joint disease in her knee years ago and by 2014, she was regularly using a cane to walk and often used a "knee sleeve." In 2016, X-rays revealed that there was no cartilage in the inner right side of her knee. Harmon described the pain at that time as "unbearable" and explained that it prevented her from being able to stand, bend, or walk during flare-ups. At those times, she would be able to walk only short distances with a cane and always had to use an elevator. Bending from the waist became "nearly impossible."

Harmon further alleged that Sollars would have been well aware of her knee issues. The two had adjacent offices, he would have seen her walking with a cane, and she discussed her knee condition with him "many times in personal conversations." Harmon described one such occasion, when Sollars saw her "struggling on [her] cane" and she told him that the joint was "bone-on-bone." Also in 2016, Harmon was injured while on the job at TSU when a chair she was sitting on broke. Sollars filled out the injury report and indicated Harmon had injured her knee and back. She told him that she thought the fall had made her knee

problems worse.

By 2018, Harmon said that her knee condition had worsened and the steroid shots she took periodically were no longer effective. On November 6, 2018, Harmon met with a TSU benefits specialist who told Harmon that she likely qualified for leave under the Family Medical Leave Act in order to have surgery on the knee. The specialist said that she would inform Sollars. On November 26, the specialist informed Harmon that she indeed qualified for leave, which was to start on January 14, 2019, and that the specialist would tell Sollars. Beginning the week of November 26, Harmon had a series of appointments related to the upcoming surgery, including a pre-surgical risk assessment scheduled for December 18. Harmon explained that "[e]ach appointment was crucial to my surgery and could not be re-scheduled because of the surgeon's schedule, other doctors' scheduling, and because of my FMLA leave schedule." In his own declaration, Sollars denied that he knew about Harmon's pending leave or the extent of her knee trouble, but he acknowledged seeing her occasionally walk with a cane and that she had told him once or twice "that her knee was giving her trouble."

As TSU's 2018 fall semester drew to a close, Harmon completed her grading and other tasks at home. She said that at this point, her "knee condition had become so painful that [she] could not walk at all, even around [her] house." The knee was reportedly so swollen that she could not bend it at all and could not bend at the waist either. In order to attend a doctor's appointment, she had to be helped by a family member to the doctor's office and then transported in a wheelchair.

On December 14, 2018, Sollars sent Harmon an email requesting that she meet with him about a student's complaint regarding one of her classes. Harmon declined, stating, "I am under the doctor's care, so I regret I can not [sic] come in to talk to you." Later that same day, Sollars sent an email to Dean Needha

Boutté-Queen requesting that Harmon not be permitted to teach in the spring 2019 semester even though her contract ran through the end of that semester. Sollars gave as his reasons that Harmon was not available for students during required office hours, did not return student calls and emails, was "abrupt," "insulting," and "bullying" towards students, and graded students too harshly, meaning that many of her freshman English students did not advance. He also noted that she had alienated herself from other staff, served on no committees despite being asked to do so, and had refused to meet with him. Boutté-Queen forwarded Sollars email to the university provost and added that she herself had that very day seen two emails regarding Harmon's lack of responsiveness to students.

On December 17, 2018, Sollars again emailed Harmon. The subject line of the email states, "Required meeting 9:30 A.M. tomorrow, December 18, 2018, 309 Hannah Hall." The text of the email states "[y]ou are requested to meet with Dean Boutté-Queen and me" and then repeats the time and place. In his declaration in support of the plea, Sollars stated that the purpose of the meeting was to discuss the termination of Harmon's employment with TSU but had "Harmon attended and displayed assurances that she would conduct herself in a more professional manner regarding her duties as a teacher at TSU, the outcome could have been favorable to her."

At this point, TSU's fall semester had ended and Harmon was working from home. She responded to Sollars' email by stating, "I regret that I will not be able to make the meeting. I have a doctor's appointment. Please keep me informed with whatever is covered." Harmon also emailed Boutté-Queen directly, saying,

> I received a request that you would like to meet with me on tomorrow. I am unable to meet because I have a doctor's appointment. I have been struggling with a knee injury. The knee is so swollen, it is difficult for me to bend. Please let me know what this meeting is

4

about. Your response to my request is greatly appreciated.

Sollars subsequently responded to Harmon's earlier email by telling her, "I must insist on your presence at the meeting tomorrow morning at 9:30. Your continued employment is contingent upon you meeting us."

Harmon ultimately did not show for the meeting on December 18, and TSU terminated the remainder of her employment contract. Harmon thereafter filed a charge of disability discrimination against TSU with the United States Equal Employment Opportunity Commission. The EEOC dismissed the charge, concluding that Harmon was not disabled and TSU was within its rights to require her to attend the meeting on December 18, 2018. Harmon then filed the present lawsuit under Texas Labor Code chapter 21, alleging TSU failed to provide her with a reasonable accommodation and instead terminated her employment. TSU filed a plea to the jurisdiction, alleging Harmon had failed to state a prima facie case of employment discrimination and thus her claim was barred by governmental immunity. Harmon responded and both sides filed evidence, including declarations by Harmon and Sollars. The trial court granted TSU's plea and dismissed the case. In two issues on appeal, Harmon contends the trial court erred in granting the plea to the jurisdiction and in refusing to permit additional discovery.

### *Standards of Review*

As a state university, TSU is immune from suit absent an express waiver of governmental immunity. *Tex. S. Univ. v. Pepper Lawson Horizon Int'l Grp., LLC*, 634 S.W.3d 428, 435 (Tex. App.—Houston [1st Dist.] 2021, pet. filed); *see also Alamo Heights I.S.D. v. Clark*, 544 S.W.3d 755, 771 (Tex. 2018). The Texas Legislature has created a limited waiver of immunity for claims properly brought under Labor Code chapter 21. *Mission Consol. I.S.D. v. Garcia*, 372 S.W.3d 629, 636 (Tex. 2012).

To prevail on a claim of immunity from suit, a governmental defendant may challenge (1) whether the plaintiff has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the case, (2) the existence of jurisdictional facts, or (3) both. *See Tex. Dep't of Transp. v. Lara*, 625 S.W.3d 46, 52 (Tex. 2021). When, as here, the defendant challenges the existence of jurisdictional facts, the court must move beyond the pleadings and consider evidence. *See id*. The analysis then mirrors that of a traditional summary judgment. *Id*.

When the defendant challenges the plaintiff's allegations with sufficient supporting evidence, the plaintiff must raise at least a genuine issue of material fact on all challenged elements to avoid dismissal. *Alamo Heights*, 544 S.W.3d at 771; *Metro. Transit Auth. of Harris Cty. v. Douglas*, 651 S.W.3d 122, 127 (Tex. App.— Houston [14th Dist.] 2021, no pet.). When the evidence submitted to support the plea implicates the merits of the case, we take as true all evidence favorable to the plaintiff, indulging every reasonable inference and resolving any doubts in the plaintiff's favor. *Alamo Heights*, 544 S.W.3d at 771. In doing so, however, we cannot disregard evidence necessary to show context, and we cannot disregard evidence and inferences unfavorable to the plaintiff if reasonable jurors could not. *Id*.

We review a trial court's ruling on a plea to the jurisdiction de novo. *See Douglas*, 651 S.W.3d at 127. Because the legislature intended for state law to correlate with federal law in employment discrimination cases, we may look to analogous federal cases when applying Labor Code chapter 21. *See* Tex. Lab. Code § 21.001; *Wal–Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex. 2003); *Douglas*, 651 S.W.3d at 127.

6

### *Reasonable Accommodation*[1]

Under Texas Labor Code section 21.128, "[i]t is an unlawful employment practice" for an employer "to fail or refuse to make a reasonable workplace accommodation to a known physical or mental limitation of an otherwise qualified individual with a disability who is an employee," unless the employer "demonstrates that the accommodation would impose an undue hardship on the operation of [its] business." Tex. Labor Code § 21.128(a); *Lara*, 625 S.W.3d at 52. To prevail on her failure-to-accommodate claim, Harmon must prove that: (1) she is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the employer; and (3) the employer failed to make reasonable accommodations for such known limitations. *See Feist v. Louisiana*, 730 F.3d 450, 452 (5th Cir. 2013).[2] In its plea to the jurisdiction and on appeal,

---

[1] There appears to be some disconnect between the parties regarding exactly what claim or claims Harmon is raising in this lawsuit and pursuing in this appeal. Harmon steadfastly maintains that her cause of action is a reasonable accommodation claim pursuant to Texas Labor Code section 21.128. TSU, however, analyzes the trial court's holding as though Harmon has raised both a reasonable accommodation claim under that section and a traditional adverse employment action claim under Labor Code section 21.051. These are distinct causes of action. *See, e.g.*, *Dillard v. City of Austin, Tex.*, 837 F.3d 557, 562 (5th Cir. 2016); *Sandel-Garza v. BBVA Compass Bancshares, Inc.*, No. 5:18-CV-128, 2020 WL 2309828, at *6 (S.D. Tex. May 7, 2020); *see also Lara*, 625 S.W.3d at 61 (holding court of appeals erred in concluding plaintiff only raised reasonable accommodation claim and not additional adverse-action claim for termination); *Jones v. Texas Dep't of Pub. Safety*, No. 03-20-00615-CV, 2022 WL 318585, at *12 (Tex. App.—Austin Feb. 3, 2022, no pet.) (mem. op.) ("A failure-to-accommodate claim is similar to a discrimination claim but has different elements.").

We conclude Harmon is only pursuing a reasonable accommodation claim for several reasons. To begin with, as stated, Harmon insists she has but one claim for reasonable accommodation. Moreover, in her briefing, Harmon cites only Labor Code section 21.128 and not section 21.051. Additionally, Harmon cites and attempts to establish the elements of a reasonable accommodation claim and primarily cites cases concerning reasonable accommodation.

[2] Some courts state the elements slightly differently, but the requirements are the same. *See, e.g.*, *Datar v. Nat'l Oilwell Varco, L.P.*, 518 S.W.3d 467, 474 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) ("[T]o establish a failure to accommodate claim, an appellant must show that: '(1) [she] is an individual with a disability; (2) the employer had notice of the

TSU concedes that Harmon is a qualified individual, but it challenges whether (1) Harmon has a disability, (2) TSU had knowledge of the disability and its consequential limitations, and (3) it refused to make reasonable accommodations. The trial court did not state its basis for granting TSU's plea. We will begin by discussing whether Harmon presented evidence of a disability and then will turn to the question of whether Harmon adequately informed TSU of the need for a disability-related accommodation and TSU's response.

**Did Harmon have a disability?** Labor Code chapter 21 defines "disability" as "a mental or physical impairment that substantially limits at least one major life activity of that individual, a record of such an impairment, or being regarded as having such an impairment." Tex. Labor Code § 21.002(6). Major life activities include, among numerous other possibilities, walking, standing, and bending. *Id*. § 21.002(11-a). "[T]o be substantially limited means to be unable to perform a major life activity that the average person in the general population can perform, or to be significantly restricted in the ability to perform it." *E.E.O.C. v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 614 (5th Cir. 2009); *see also Tex. Dep't of Fam. & Protective Servs. v. Howard*, 429 S.W.3d 782, 787 (Tex. App.—Dallas 2014, pet. denied).

As discussed above, Harmon explained in her declaration that she had experienced degenerative joint disease symptoms in her right knee for several years and X-rays revealed she had no cartilage in the inner right side of the knee and the joint was "bone-on-bone." She further described the pain as being "unbearable" during flare-ups, and she regularly used a cane and often a "knee sleeve." She said that during flare-ups, the knee problem prevented her from being

---

disability; (3) with reasonable accommodations [she] could perform the essential functions of [her] position; and (4) . . . the employer refused to make such accommodations.'").

able to stand, bend, or walk, and bending at the waist became "nearly impossible." Harmon further asserted that by 2018, her knee condition had worsened and by the end of the fall semester, the "knee . . . had become so painful that [she] could not walk at all, even around [her] house," she could not bend it at all, and she could not bend at the waist either. She even had to be transported to a doctor's appointment in a wheelchair. Harmon's assertions regarding her knee are supported by comments she made in an email to Boutté-Queen, in which she stated that she had "been struggling with a knee injury. The knee is so swollen, it is difficult for me to bend." The record also contains the certification filed by Harmon's physician in support of her request for FMLA leave for a "Serious Medical Condition." In the certification, the doctor stated that he had been treating Harmon since June 2018, and she was diagnosed with osteoarthritis that required surgery among other treatments. Harmon was approved for FMLA leave on December 18, 2018, and the leave was to run from January 14, 2019 until April 1, 2019.

TSU stresses that Harmon's condition appears to be "episodic" or only debilitating during flare-ups and suggests that the evidence was only sufficient if she proved she was having a flare-up at the time of the alleged discriminatory action. TSU does not cite any authority for this proposition, but even if TSU is correct, Harmon presented evidence that her knee condition was at its worst at the time she was allegedly denied a reasonable accommodation; at that point, according to Harmon, the knee had become so painful she could not walk or bend at all and had to be transported to a doctor's appointment in a wheelchair.

With little analysis of the evidence, TSU also suggests Harmon's knee condition was only transitory and minor and that she did not provide sufficient evidence regarding the nature, severity, duration, or expected duration of the condition. Harmon, however, presented evidence that she had been experiencing

symptoms of a degenerative joint disease for years, her physician diagnosed her with osteoarthritis requiring surgery and additional post-operative treatments, and X-rays showed the knee joint had no cartilage on one side and was bone-on-bone. Harmon also detailed the pain and lack of mobility caused by the condition over the years. *See Chevron Phillips*, 570 F.3d at 618–19 (discussing evidentiary requirements when a condition is intermittent and noting "temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities") (quoting 29 C.F.R. § 1630.2(j) and *Pryor v. Trane Co.*, 138 F.3d 1024, 1026 (5th Cir. 1998)). While Harmon's knee problem was worse during "flare-ups," based on her description, it was certainly not temporary, non-chronic, of short duration, or with little or no long term impact.

Taking all evidence favorable to Harmon as true and indulging every reasonable inference and resolving any doubts in her favor, we conclude that a reasonable jury could find that Harmon had a disability. *See Alamo Heights*, 544 S.W.3d at 771. Harmon presented evidence that a physical impairment (her knee condition) substantially limited, i.e., significantly restricted, several major life activities (walking, standing, bending). *See* Tex. Labor Code § 21.002(6), (11-a); *Chevron Phillips*, 570 F.3d at 614; *see also Williams v. Tarrant Cty. Coll. Dist.*, 717 F. App'x 440, 448 (5th Cir. 2018) (holding plaintiff's own declaration was sufficient to create a genuine issue of fact regarding disability).

**Did Harmon inform TSU of her need for a medically related accommodation?** The law governing the request for a reasonable accommodation by an employee with a disability was succinctly laid out by the Fifth Circuit in *Chevron Phillips*:

> An employee who needs an accommodation because of a disability has the responsibility of informing her employer. The employee must explain that the adjustment in working conditions or duties she is

seeking is for a medical condition-related reason, but the employee does not have to mention the ADA or use the phrase "reasonable accommodation." Plain English will suffice.

This court has recognized that where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, the initial burden rests primarily upon the employee . . . to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations.

570 F.3d at 621 (citations and internal quotations omitted); *see also Lara*, 625 S.W.3d at 53–54; *Jones v. Tex. Dep't of Pub. Safety*, No. 03-20-00615-CV, 2022 WL 318585, at *13 (Tex. App.—Austin Feb. 3, 2022, no pet.) (mem. op.).

The Texas Supreme Court has described the law governing such requests as "lenient" and quoted an EEOC guidance document as requiring that "an employee need only 'let the employer know that [the employee] needs an adjustment or change at work for a reason related to [a] medical condition.'" *Lara*, 625 S.W.3d at 53–54 (quoting U.S. Equal Employment Opportunity Commission, EEOC-CVG-2003-1, Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the ADA (2002)). The court further quoted the Third Circuit in explaining that "[w]hat matters [is] whether the employee . . . provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation." *Id*. at 53 (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999)).

In this case, it is first important to understand the evidence as it relates to the history of Harmon's condition and TSU's knowledge before considering Harmon's purported request. According to Harmon's declaration, since 2014, she has regularly used a cane to walk around campus and often used a "knee sleeve" as well. By 2016, during flare-ups, she could only walk short distances with a cane

11

and always had to use an elevator. She said that her supervisor, Sollars, would have been aware of her knee issue because the two had adjacent offices, he would have seen her walking with a cane, and she discussed her knee condition with him "many times in personal conversations." On one such occasion, when Sollars saw her "struggling on [her] cane," she told him the joint had become "bone-on-bone." Also, in 2016, Sollars filled out an injury report for an on-the-job incident indicating Harmon had injured her knee and back. She then told him that she thought the fall had made her knee problem worse. Harmon further explained that she met twice with a TSU benefits specialist in November 2018 who told Harmon that she, the specialist, would inform Sollars that Harmon qualified and was approved for FMLA leave for knee surgery and post-operative care. In his own declaration, Sollars acknowledged seeing Harmon occasionally walk with a cane and that she told him once or twice "that her knee was giving her trouble."

We now turn to Harmon's purported request for an accommodation. On December 14, 2018, Harmon responded to Sollars' request for a meeting by saying, "I am under the doctor's care, so I regret I can not [sic] come in to talk to you." Then, on December 17, 2018, in response to another email from Sollars regarding a meeting between Sollars, Harmon, and Boutté-Queen, Harmon first informed Sollars, "I regret that I will not be able to make the meeting. I have a doctor's appointment," and then emailed Boutté-Queen, saying, "I am unable to meet because I have a doctor's appointment. I have been struggling with a knee injury. The knee is so swollen, it is difficult for me to bend."

TSU emphasizes Sollars' declaration statements indicating he was unaware of Harmon's pending FMLA leave or the extent of her knee trouble. TSU asserts that it is speculative to say Sollars knew her knee was "bone-on-bone" or was otherwise aware of the limitations caused by her knee condition. Sollars stated that

12

he both saw her walk with a cane and without, only had one or two conversations with her about her knee, and never saw her with a knee brace. TSU also points out that at the time of the meeting request, Harmon was working from home so no one at TSU would have known she could not walk or had other substantial limitations.

We agree with TSU that Harmon's statements regarding what Sollars knew about her injury are to some extent speculative. Even so, taking all evidence favorable to Harmon as true and indulging every reasonable inference and resolving any doubts in her favor, we conclude that a reasonable jury could find that Harmon adequately informed TSU of her need for a medically related accommodation. *See Chevron Phillips*, 570 F.3d at 621; *Lara*, 625 S.W.3d at 53–54; *Alamo Heights*, 544 S.W.3d at 771. Harmon presented evidence that Sollars had known for years that Harmon had problems with her knee, and in light of that knowledge, Harmon twice declined Sollars request for a meeting because she was under a doctor's care and had a doctor's appointment. Reasonably implicit in her communication with Sollars was the idea that Sollars could not make the meeting *because* she was under a doctor's care and had a doctor's appointment. Perhaps more importantly, Harmon also informed Boutté-Queen that she had been struggling with a knee injury, the knee was so swollen that it was difficult for Harmon to bend, and Harmon could not make the meeting because of a doctor's appointment, presumably related to the knee condition. Based on the internal TSU email correspondence provided, it appears that Boutté-Queen and Sollars were the primary decision-makers regarding the termination of Harmon's employment with TSU.

TSU also argues that Harmon failed to request a specific accommodation. However, it can be easily inferred from Harmon's communication with Sollars and Boutté-Queen that Harmon needed the meeting either cancelled, moved to another

time or date, or perhaps conducted by video or teleconference. *See, e.g.*, *Kowitz v. Trinity Health*, 839 F.3d 742, 747 (8th Cir. 2016) (holding evidence raised a material issue of fact where employee's notification to supervisor that she would not be able to obtain a required certification until she had completed physical therapy implied that an accommodation would be required until such time); *Tygrett v. City & Cty. of Denver Acting by & Through Its Bd. of Water Comm'rs a/k/a Denver Water*, No. 19-CV-00726-MEH, 2020 WL 6873953, at *12 (D. Colo. Nov. 23, 2020) (holding employee telling supervisor he could not perform task due to back injury constituted a request for a reasonable accommodation). Moreover, an employee is not required to come up with a solution on her own; as will be discussed in more detail below, once the employee makes a request, the employer must engage in an interactive process so that together employer and employee can determine what reasonable accommodation might be best. *See Chevron Phillips*, 570 F.3d at 621–22; *Lara*, 625 S.W.3d at 53; *Cutrera v. Bd. of Supervisors of La. St. Univ.*, 429 F.3d 108, 113 (5th Cir. 2005).

Based on the foregoing and given the lenient standard for making a reasonable accommodation request, we conclude Harmon presented sufficient evidence to raise a material issue of fact regarding whether she adequately informed TSU of her need for a reasonable accommodation. *See Chevron Phillips*, 570 F.3d at 614; *Lara*, 625 S.W.3d at 53–54. At a minimum, the evidence supports the reasonable conclusion that Harmon informed TSU that she needed an adjustment, change, or reasonable accommodation at work (i.e., to miss the December 18 meeting or have it rescheduled or conducted by another means) for a reason related to a medical condition (i.e., she was under a doctor's care and had a doctor's appointment for a debilitating knee condition). *See Lara*, 625 S.W.3d at 53–54. We turn now to the question of whether TSU refused to make a reasonable

14

accommodation for Harmon.

**Did TSU refuse to make a reasonable accommodation?** As also set forth in *Chevron Phillips*,

> [o]nce an employee makes [a request,] the employer is obligated by law to engage in an interactive process: a meaningful dialogue with the employee to find the best means of accommodating that disability. . . . When an employer does not engage in a good faith interactive process, that employer violates the ADA—including when the employer discharges the employee instead of considering the requested accommodations.

570 F.3d at 621 (citations and internal quotations omitted); *see also Cutrera*, 429 F.3d at 113 ("An employer may not stymie the interactive process of identifying a reasonable accommodation for an employee's disability by preemptively terminating the employee before an accommodation can be considered or recommended."). By the same token, an employer cannot be found to have committed employment discrimination when the employee and not the employer caused a breakdown in the good faith interactive process. *See, e.g.*, *Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 481 (5th Cir. 2016); *Hagood v. Cty. of El Paso*, 408 S.W.3d 515, 525 (Tex. App.—El Paso 2013, no pet.).[3]

Here, it is clear from the evidence that TSU did not offer a reasonable accommodation to Harmon and instead discharged her without engaging in a good faith interactive process to determine a reasonable accommodation. While the evidence is not conclusive that TSU caused the breakdown of the interactive process rather than Harmon, the evidence at least raises a fact issue regarding whether TSU caused the breakdown and then discharged Harmon instead of

---

[3] It should be noted that a failure to engage in a good faith interactive process is not a per se violation; the interactive process is but a means to the end of finding reasonable accommodations. *See, e.g.*, *Silva v. City of Hidalgo, Tex.*, 575 F. App'x 419, 424 (5th Cir. 2014); *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 736 (5th Cir. 1999).

considering an accommodation. As set forth above, after Harmon indicated to Sollars and Boutté-Queen that she could not attend the meeting because she was under a doctor's care and had a doctor's appointment due to her knee condition, Sollars responded, "I must insist on your presence at the meeting tomorrow morning at 9:30. Your continued employment is contingent upon you meeting us." It was at this point that communication ceased. A jury could reasonably conclude, based on the evidence presented, that Sollars insistence that Harmon attend a meeting that she said she was unable to attend for medical reasons caused the breakdown of the interactive process and that TSU then terminated Sollars instead of considering an accommodation. *See Chevron Phillips*, 570 F.3d at 621; *Cutrera*, 429 F.3d at 113. It should be noted again here that in his declaration, Sollars acknowledged that had Harmon been able to attend the meeting and had she there "displayed assurances that she would conduct herself in a more professional manner regarding her duties as a teacher at TSU, the outcome [of the meeting] could have been favorable to her."

Without citation to legal authority, TSU argues that it was not required to provide Harmon with a reasonable accommodation because she failed to follow TSU policy for requesting an accommodation, which required she make the request in writing to the TSU ADA Coordinator at least two weeks before the date of the requested accommodation. Obviously, Harmon could not have met this policy for a mandatory meeting of which she was given less than 24-hours' notice. More importantly, TSU's policy does not have the force of law and meeting its requirements is not a prerequisite for a reasonable accommodation claim. *See Sandel-Garza v. BBVA Compass Bancshares, Inc.*, No. 5:18-CV-128, 2020 WL 2309828, at *12 (S.D. Tex. May 7, 2020) ("BBVA conflates its company policies with federal discrimination law. A request need not take any particular form so

16

long as the employee explains that the accommodation is 'for a medical condition-related reason.'") (quoting *Chevron Phillips*, 570 F.3d at 621); *see also Lara*, 625 S.W.3d at 53.

TSU additionally argues that attending a mandatory meeting was an essential function of Harmon's job; thus, TSU was not required to accommodate Harmon's inability to attend the meeting as scheduled, citing *Harville v. Texas A&M University*, 833 F. Supp. 2d 645, 660–61 (S.D. Tex. 2011) ("[A]n employer's duty to make reasonable accommodations does not require [it] to 'relieve the employee of any essential functions of the job, modify the actual duties, or reassign existing employees or hire new employees to perform those duties.'") (quoting *Robertson v. Neuromedical Ctr.*, 161 F.3d 292, 295 (5th Cir. 1998)). This argument, however, ignores the possibility that the meeting simply could have been rescheduled to a time or date when Harmon could attend or could have occurred by video or teleconference. TSU offers no reason why the meeting had to occur at the time, date, and location chosen by Sollars. The very point of Harmon's lawsuit is that rather than engage in the process of determining a reasonable accommodation, TSU terminated her employment.

**Conclusion.** The evidence Harmon produced in response to TSU's plea to the jurisdiction was sufficient to raise material issues of fact regarding whether Harmon had a disability, whether she properly informed TSU of her need for a medically related accommodation, and whether TSU discharged Harmon instead of engaging in a good faith interactive process to determine an appropriate reasonable accommodation. It was undisputed that Harmon was qualified for the job she held. Accordingly, we sustain Harmon's first issue contending that the trial court erred in granting TSU's plea and dismissing her discrimination lawsuit. *See Feist*, 730 F.3d at 452.

### Remaining Issue

In her second issue, Harmon contends that the trial court erred in refusing to allow additional discovery prior to ruling on the plea to the jurisdiction. Because we reverse the trial court's ruling on the plea to the jurisdiction, we do not reach the second issue.

### Conclusion

The trial court erred in granting TSU's plea to the jurisdiction. Accordingly, we reverse the trial court's dismissal order and remand for further proceedings.

/s/    Frances Bourliot
        Justice

Panel consists of Chief Justice Christopher and Justices Bourliot and Spain. (Spain, J., concurring without opinion).