# United States Court of Appeals
# for the Fifth Circuit

_____

No. 24-20144

_____

Jamilah Way,

*Plaintiff—Appellant*,

*versus*

City of Missouri City; Ehimwenma Izehiese Iyamu,

*Defendants—Appellees*.

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:22-CV-539

_____

Before Smith, Higginson, and Douglas, *Circuit Judges*.

Jerry E. Smith, *Circuit Judge*:

While employed as a lawyer at the City of Missouri City, Texas, from August 2018 to January 2021, Jamilah Way developed anxiety and fibroids, eventually requesting accommodations and time off. She was fired shortly after returning from leave that she took per the Family and Medical Leave Act ("FMLA"). She sued under the FMLA, the Americans with Disabilities Act ("ADA"), and the Texas Commission on Human Rights Act ("TCHRA"). The district court granted the City summary judgment on each of Way's claims. We affirm in part and reverse in part and remand.

United States Court of Appeals
Fifth Circuit
**FILED**
April 9, 2025
Lyle W. Cayce
Clerk

No. 24-20144

## I. Background

Way was hired as the First Assistant City Attorney in August 2018. Her direct supervisor was the City Attorney, E. Joyce Iyamu.[1] Way's claims stem from Iyamu's alleged treatment of Way during Way's employment.[2]

In August 2019, Way informed Iyamu in an email that she was developing anxiety and had scheduled a doctor's appointment. Iyamu replied, acknowledging that Way "seem[ed] overwhelmed." The next day, Way welled up with tears in front of Iyamu. Way asked her "for specific accommodations to allow [Way] to cope," including "clear expectations, timelines and workflows that work for everyone, and for [Iyamu] to provide this information in writing." Soon after Way made that request, Iyamu emailed Martin Russel, the City's human resources director, to ask how she could "reclassify the 'First Assistant City Attorney' position to just 'Assistant City Attorney.'"

In September 2019, Way began experiencing pelvic floor spasms at work. On September 23, the pain prompted her to tell Iyamu that she needed to leave work early and head to the hospital. The following day, Way told Iyamu about the severity of her condition and that she had been prescribed several medicines to control the spasms and cope with the pain. To drive home the point, Way lined her new pill bottles up on her desk and explained to Iyamu what each medication was for and why it had been prescribed. About two months later, Way contacted Russell to express her grievances about how Iyamu had treated her since learning of Way's medical problems, including Iyamu's refusal to accommodate Way's need for time off work.

---

[1] Although Iyamu is named as a party, Way's claims concern the City only and are not brought against Iyamu in her personal capacity.

[2] The following facts are drawn primarily from Way's amended complaint and her sworn declaration. We also glean from other documents in the record on appeal ("ROA").

The City then hired an outside law firm to investigate Way's internal complaint.

In June 2020, Way gave Russell a handwritten note and medical certification form requesting the ability to flex her schedule on certain days and to work remotely for the bulk of July 2020. Way's note said that she would request leave during July for surgery and "appointments that may take longer than most." The certification form related that Way suffered from "several months of dysfunctional uterine bleeding" and would require surgery and multiple appointments. Russell and Iyamu deemed Way's requests "reasonable," provided that Way followed the City's remote-work guidelines. The City granted all of Way's FMLA leave requests.

In August or September 2020, the City Manager asked Iyamu for suggestions about how to make the legal department more efficient. Iyamu contacted Charles Thompson, a trade group representative for municipal lawyers. Thompson told Iyamu that his review of Iyamu's department suggested that the City Attorney's office lacked "sufficient support staff to provide prompt and effective service in a fiscally prudent manner." He noted that the City's legal budget appeared to be "substantially lower" than that of similar cities and that even if the City hired an additional paralegal at a "competitive salary," the City's legal budget would still be "well within norms."

On October 30, 2020, Way began her second period of FMLA leave to undergo another surgery, returning to work on December 16, 2020. The next day, Way alerted Iyamu and Russell that she needed yet another surgery, meaning she would need to take four more days of FMLA leave at the end of the month. The City approved her request on December 18, noting that it would be coded as "FML[A] admin leave without pay."

On December 23, Way perceived a "sudden reduction" in her salary, which she believes resulted from the City's incorrectly classifying her

FMLA status. Way also asserts that there were inaccuracies in how her time off was coded and "unwarranted threats of placing [her] on unpaid administrative leave."

Way's third period of FMLA leave ended on December 31, 2020. On January 19, 2021, she was informed by letter that the City Council had eliminated her position and that her employment was terminated, effective immediately. The letter stated that, in "August of 2019, the City Attorney reported to the City Manager that the position of First Assistant City Attorney was not a practical application of the City's resources in the operation of that department." The letter then noted that, on "January 11, 2021, the City Council took action during a special council meeting to eliminate the position of the First Assistant City Attorney effective January 12, 2021."

Way sued the City in February 2022, alleging discrimination and retaliation under the ADA, retaliation in violation of the FMLA, and discrimination and retaliation in violation of the TCHRA. The district court dismissed some of Way's claims, including all claims brought against Iyamu in her individual capacity, but granted Way leave to amend. Her amended complaint re-pleaded her original claims and added an allegation of interference in violation of the FMLA. The district court granted the City summary judgment on all claims.

## II. Standard of Review

We review a summary judgment *de novo*, applying the same standard as the district court in the first instance. *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014). We interpret facts and draw reasonable inferences in favor of the nonmovant. *Id.* Summary judgment is appropriate only where the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

On summary judgment, courts may not "evaluate the credibility of the

witnesses, weigh the evidence, or resolve factual disputes" because the "sole question is whether a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor." *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021) (cleaned up). Self-serving affidavits "may create fact issues even if not supported by the rest of the record," but they will not be credited if they are "conclusory, vague, or not based on personal knowledge." *Id.* at 160–61. An unsworn declaration may be treated as an affidavit if it contains a statement that the contents of the declaration are "true and correct" under penalty of perjury. 28 U.S.C. § 1746.[3]

### III. Analysis

Way brings four claims: (A) discrimination in violation of the ADA and TCHRA, (B) retaliation in violation of the ADA and TCHRA, (C) interference in violation of the FMLA, and (D) retaliation in violation of the FMLA.[4]

### A. ADA and TCHRA Discrimination

Way asserts that the City discriminated against her in violation of the ADA and TCHRA. Specifically, she alleges that the City's decision to terminate her position and its failure to accommodate reasonably her requests

---

[3] *See also Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1306–07 (5th Cir. 1988) (recognizing that rule). Way's declaration "declare[s] under penalty and [*sic*] perjury that the foregoing is true and correct."

[4] Like the district court, we analyze Way's ADA and TCHRA claims concurrently because the TCHRA "is modeled after federal law." *B.C. v. Steak N Shake Operations, Inc.*, 512 S.W.3d 276, 279 (Tex. 2017) (citation omitted). "Accordingly, Texas courts look to analogous federal law in applying the state Act." *Id.* (cleaned up); *accord Rodriguez v. ConAgra Grocery Prods. Co.*, 436 F.3d 468, 473–74 (5th Cir. 2006) ("Given the similarity between the ADA and the TCHRA, Texas courts look to analogous federal precedent for guidance when interpreting the Texas Act.") (quotation omitted).

were undertaken because of her disabilities.  The district court granted summary judgment on those claims because it found that Way did not tell the City about the limitations resulting from her alleged anxiety or fibroids.  Because Way points to sufficient record evidence to support a jury finding that the City failed to accommodate her anxiety, we reverse the summary judgment in part.

### 1. Legal Framework

The ADA, 42 U.S.C. §§ 12101 *et seq.*, "is a federal antidiscrimination statute designed to remove barriers which prevent qualified individuals with disabilities from enjoying the same employment opportunities that are available to persons without disabilities." *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 161 (5th Cir. 1996).  The ADA thus makes it unlawful for covered entities to "discriminate against a qualified individual on the basis of disability[.]" § 12112(a).[5]

"Discrimination" under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee." § 12112(b)(5)(A).[6]  An employer can reasonably accommodate qualified individuals by, *inter alia*, "job restructuring" or "part-time or modified work schedules."  § 12111(9).

"A disability is a physical or mental impairment that substantially limits one or more of the major life activities of such individual."  *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 222 (5th Cir. 2011) (cleaned up).  The term "substantially limits" must be "construed broadly in favor of expansive

---

[5] The City does not dispute that it is a covered entity.  *See* § 12111(2).

[6] The City does not dispute that Way is a qualified individual.  *See* § 12111(8).

coverage," and the term "major" must "not be interpreted strictly to create a demanding standard for disability." 29 C.F.R. § 1630.2(j)(1),(i)(2).[7] "[C]ourts are to make an individualized determination of whether an employee's impairment constitutes a disability," *Griffin*, 661 F.3d at 222, and courts "have recognized numerous episodic conditions—including depression, post-traumatic stress disorder, and other mental health conditions where an individual may experience flare-ups—as disabilities," *Mueck v. La Grange Acquisitions, L.P.*, 75 F.4th 469, 479–80 (5th Cir. 2023).[8]

To establish a claim of disability discrimination, a plaintiff can either present "direct evidence of discrimination" or use the indirect method of proof in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995).[9] In either case, "[t]o prove discrimination, an employee must show that the employer knew of such employee's substantial physical or mental limitation." *Taylor*, 93 F.3d

---

[7] Per § 1630.2(i)(1), major life activities include but are not limited to "(i) [c]aring for oneself . . . sleeping . . . learning, reading, concentrating, thinking, communicating, interacting with others, and working" and "(ii) [t]he operation of a major bodily function, including . . . endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions."

[8] If the scope of "disability" seems wide, it is intentionally so. Initially enacted in 1990, the ADA was amended in 2008 to "make it easier for people with disabilities to obtain protection under the ADA," principally by "broadening the definition of disability." *Cannon v. Jacobs Field Servs. N. Am., Inc.*, 813 F.3d 586, 590 (5th Cir. 2016) (cleaned up).

[9] Under *McDonnell Douglas*, a plaintiff must first make out a *prima facie* case of discrimination by showing that (1) she suffers from a disability; (2) she is qualified for the job; (3) she was subject to an adverse employment action; and (4) she was treated less favorably than non-disabled employees. *See Daigle*, 70 F.3d at 396. Then, "[o]nce the plaintiff has stated a prima facie case, the defendant must 'articulate some legitimate nondiscriminatory reason' for its action that adversely affected the employee." *Id.* (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)). If the defendant produces any evidence to support a nondiscriminatory reason for the adverse action, the "employer's intent is a question of fact, for which the plaintiff carries the burden of persuasion." *Id.*

at 163. "If the employee fails to request an accommodation, the employer cannot be held liable for failing to provide one." *Id.* at 165. But "a plaintiff need not request, or even know, the particular reasonable accommodation [s]he ultimately requires." *Windham v. Harris Cnty.*, 875 F.3d 229, 237 n.11 (5th Cir. 2017). Instead, "[t]hat judgment 'is best determined through a flexible, interactive process' involving both the plaintiff and the public entity." *Id.* (quoting *Taylor*, 93 F.3d at 165).[10] Where an employer does not engage in that good-faith, interactive process, the employer violates the ADA. *Cutrera v. Bd. of Supervisors of La. St. Univ.*, 429 F.3d 108, 112 (5th Cir. 2005).

In short, to survive summary judgment, Way must show that a reasonable jury could find that she satisfies three elements: (1) that her anxiety and fibroids were qualifying disabilities; (2) that the City knew about her disabilities; and (3) that the City failed to accommodate her reasonably. *See Patton v. Jacobs Eng'g Grp., Inc.*, 874 F.3d 437, 442 (5th Cir. 2017).[11]

### 2. Application

Way avers that both her anxiety and her fibroids are qualifying disabilities, that she made known to the City the limitations that her anxiety and fibroids caused, and that the City failed to accommodate those limitations.

### a. Anxiety

We first address whether Way "has put forth evidence raising a triable issue of fact as to whether [her anxiety] amounts to a disability," *Mueck*, 75 F.4th at 483—that is, whether Way's anxiety is "a physical or mental impairment that substantially limits one or more" of Way's "major life activ-

---

[10] As we stated in *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009), an "interactive process" is "a meaningful dialogue with the employee to find the best means of accommodating that disability."

[11] The same principles apply to Way's TCHRA claim. *See supra* note 4.

ities." § 12102(1)(A).  Our inquiry "requires assessing whether [Way's] impairment substantially limits h[er] ability to perform a major life activity as compared to most people in the general population." *Mueck*, 75 F.4th at 479 (cleaned up).

Given the expansive construction given to "substantially limits" and "major life activities," Way's anxiety satisfies the statute.[12]  Her complaint alleged that her anxiety causes her "thoughts to race," "affects her ability to think and concentrate," "causes Way to become fixated on tasks," and ultimately "resulted in an inability to sleep and eat until she began her anti-anxiety medication."

Way's contemporaneous communications to Iyamu support her assertions.  Those emails reveal that Way told Iyamu in August 2019 that she was "developing anxiety" and had made a medical appointment to address it and that, around the same time, Way found herself overwhelmed by stress and welled up with tears in Iyamu's office.  Way also attests in her declaration that her anxiety had "a profound impact" on her in ways that affect her "major life activities," specifically by "disrupt[ing] her ability to focus and concentrate" and manifesting in physical symptoms like "a racing heart, trembling, and shortness of breath."  *Cf.* 29 C.F.R. § 1630.2(j)(1), (i)(2).

Although courts "initially construed the definition of disability narrowly, particularly in the context of determining whether an impairment substantially limited a major life activity," Congress enacted the ADA Amendments Act of 2008 with the goal of "reinstating a broad scope of protection

---

[12] *See* 29 C.F.R. § 1630.2(i)(2) ("In determining other examples of major life activities, the term 'major' shall not be interpreted strictly to create a demanding standard for disability."); § 1630.2(j)(1)(i) ("The term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA.").

to be available under the ADA." *Mueck*, 75 F.4th at 479 (quotations omitted). Those amendments "directed that courts, in assessing whether an impairment substantially limits a major life activity, interpret and apply the term 'substantially limits'" to afford greater protection to individuals asserting disabilities under the ADA. *Id.* (cleaned up). Therefore, "a jury reasonably could find" that Way's major life activities "of caring for herself, sleeping, and thinking" were substantially limited, rendering Way "disabled under the ADA." *Chevron Phillips*, 570 F.3d at 620.[13]

Next, Way must point to evidence in the record showing that she informed her employer of her disability, limitations, and requisite accommodation. A reasonable jury must be able to find that the City *knew* about Way's anxiety and was asked to accommodate it, because an "employer cannot be held liable for failing to provide" an accommodation that an "employee fails to request." *Taylor*, 93 F.3d at 165.

The record evidence Way invokes to support her failure-to-accommodate theory is sparse but sufficient. She first cites her email to Iyamu on August 14, 2019, in which she wrote that she was "developing anxiety" and had an appointment scheduled to address that concern.[14] Iyamu replied that night, noting that Way "seem[ed] overwhelmed" and recalling an incident earlier in the week when Way had "laid [her] head on the conference table" during a meeting.[15] The next day, Way "found [her]-

———————————

[13] Although we have held that a diagnosis of anxiety does not necessarily support a finding that a plaintiff is likely to succeed in proving a disability, our decisions "do not hold that anxiety disorders can *never* be a disability under the ADA." *Mann v. La. High Sch. Athletic Ass'n*, 535 F. App'x 405, 412 (5th Cir. 2013) (per curiam) (emphasis added).

[14] The exact words were: "I am developing anxiety. (I have doctors appoint [*sic*] scheduled for August 20, 2019 to address this.)"

[15] The relevant portion of Iyamu's email reads: "It is partly because you seem overwhelmed, as exhibited in the meeting earlier this week when you laid your head on the

self overwhelmed and tears welled up in the presence of [Iyamu]," who "sarcastically inquired as to the reason behind [Way's] emotional distress."

Both the email and the tearful interaction could have communicated to Iyamu that Way was suffering from anxiety. Way "need not utter any magic words" to inform her employer of her disability. *Patton*, 874 F.3d at 444. Instead, she need only point to enough evidence in the record to allow a jury "to infer [the City's] knowledge of the 'limitations experienced by the employee as a result of [her] disability.'" *Id.* at 444–45 (quoting *Taylor*, 93 F.3d at 164) (emphasis removed). A reasonable jury considering Way's evidence could make that inference.

After disclosing her disability, Way needed to "explain that the adjustment in working conditions or duties she is seeking is for a medical condition-related reason." *Chevron Phillips*, 570 F.3d at 621. Way avers that she "asked [Iyamu] for specific accommodations to allow [Way] to cope" with her anxiety, specifically asking Iyamu "for clear expectations, timelines and workflows that work for everyone, and for her to provide this information in writing." Way can point to more than just her declaration to support that claim. In a March 2020 email, she also reported that she requested help from Iyamu to address her anxiety both before and after her August 2019 anxiety-related doctor's appointment; that email also conveys that Way was diagnosed with anxiety and reiterated her accommodations request.[16]

In short, the record includes enough evidence for a jury to find that

---

conference table and the state of the submitted ordinance on what was supposed to be the due date, that I feel like I have to step in. I don't want you or any member of the team to feel like you are in an ocean without a life raft."

[16] Although there is no direct statement in Way's email specifying how or when she asked for accommodations for her anxiety, the email could help support a jury finding that Way asked Iyamu for anxiety-related accommodations.

No. 24-20144

Way's anxiety qualifies as a disability under the ADA; that Way informed her supervisor that she had, and was seeking medical help for, anxiety; that her anxiety limited her ability to perform her job; and that she requested accommodations from Iyamu.[17]

Once Way made her request, the City became "obligated by law to engage in an interactive process: a meaningful dialogue with the employee to find the best means of accommodating that disability." *Chevron Phillips*, 570 F.3d at 621 (cleaned up). "[W]hen an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accom-

---

[17] The City's cited cases do not undermine that conclusion. In *Taylor*, we held that even though an employee disclosed that he was diagnosed with bipolar disorder, because the evidence did "not show that [the employee] ever told [his employer] that he suffered a limitation as a result of his alleged impairment," the employer was entitled to summary judgment on the ADA claim. *Taylor*, 93 F.3d at 164 (emphasis removed). But Way's evidence suggests that she directly told her supervisor about her anxiety and then requested specific accommodations to help cope with it.

In *Versaggi v. KLS Martin, L.P.*, we affirmed a summary judgment for an employer where the employee alleging an ADA violation "failed to put [her employer] on notice of her disability." No. 21-20547, 2024 WL 2290653, at *2 (5th Cir. May 21, 2024) (per curiam) (unpublished). We held that although the employee requested an accommodation via email, the email said only that "the 'past 11 months' had been 'very difficult' for her" and "did not state that she was suffering from anxiety or that she needed accommodations for that reason." *Id.* But Way invokes evidence suggesting that she both stated that she had anxiety and requested accommodations for the limitations resulting from her condition.

Finally, in *Patton*, we held that the plaintiff's ADA claim failed because his only evidence was his statement that "his stuttering and anxiety problems 'all go together'" and that "at a previous job he was sensitive to noise." *Patton*, 874 F.3d at 444 (cleaned up). Those statements were "too vague to show that Patton identified his sensitivity to noise as a limitation resulting from a disability," *id.*, and thus his claim failed because "a jury must be able to infer [the employers'] knowledge of the 'limitations experienced by the employee as a result of [his] disability.'" *Id.* at 444–45 (quoting *Taylor*, 93 F.3d at 164) (cleaned up). But, again, Way *can* point to evidence suggesting that she was seeking medical treatment for anxiety and that she requested specific accommodations to help cope with that condition.

modate an employee, the employer violates the ADA." *Cutrera*, 429 F.3d at 112. So Way must point to evidence in the record that would allow a reasonable jury to find that the City either failed to engage in a good faith process or failed reasonably to accommodate Way's anxiety.

Way has met that burden. Way's declaration indicates that one day after she told Iyamu that she was developing anxiety and would seek treatment, Iyamu responded to Way's welling up in Iyamu's presence with sarcastic remarks. Way's declaration further avers that, although she asked Iyamu for accommodations in the form of written timelines and expectations, Iyamu never provided the requested information. Way thus provides evidence from which "a jury reasonably could find that [the City] did not attempt to entertain the requested accommodation." *Chevron Phillips*, 570 F.3d at 622.

Whether Way's evidence will ultimately show that her anxiety substantially limited her major life activities, that the City knew about her anxiety, and that the City failed reasonably to accommodate it is uncertain—but those are questions of weight properly left to the jury. *See Guzman*, 18 F.4th at 160. We therefore reverse the summary judgment on Way's ADA and TCHRA failure-to-accommodate claims as they relate to her anxiety.

### b. Fibroids

As for Way's fibroids, her condition—which resulted in severe pain and fatigue and ultimately permanently impaired her reproductive functions—substantially limited her major life activities and thus meets the requirements of a qualifying disability. The question is whether the City knew about Way's fibroids and failed reasonably to accommodate them. *Patton*, 874 F.3d at 442.

A reasonable jury could find that the City had knowledge of Way's fibroids. On September 13, 2019, Way informed Iyamu of needing to visit the

emergency room for intense pain.  The following day, Way explained to Iyamu and another City employee the severity of her pelvic floor spasms, noting that they required pain management that could be administered only in the hospital, a series of testing, and a follow-up appointment with a gynecologist.  Way also explained that she was prescribed several medicines to control the spasms and pain and then lined pill bottles up on her desk as she explained what each medication was for.  Further, on June 15, 2020, Way gave Russell a medical certification form that noted that she was likely to suffer "several months of dysfunctional uterine bleeding" and would need frequent visits to the doctor in June and July 2020, along with surgery requiring multiple recovery days.

But Way does not show how the City then failed reasonably to accommodate her fibroids.  Along with her medical certification form, Way's handwritten accommodation request asked permission to "flex [Way's] schedule to make time for [her] appointments" and to work remotely for the bulk of July 2020.  After Russell told Iyamu about those requests, Iyamu replied that both requests were reasonable.  Iyamu merely asked that Russell made sure that Way understood the expectations for all employees who flexed their time or worked remotely.

That response satisfies the City's obligation to "engage in an interactive process" or "meaningful dialogue with the employee to find the best means of accommodating that disability."  *Chevron Phillips*, 570 F.3d at 621 (cleaned up).  Way does not suggest that her requests to flex her time or work remotely were denied.  In her declaration, she skips from June 15, 2020—when Iyamu approved Way's requested accommodations—to October 30, 2020, when Way initiated her second FMLA leave.  But an employer's obligation to provide reasonable accommodations under the ADA is distinct from its obligations under the FMLA, and "a request for FMLA leave is not a request for a reasonable accommodation under the ADA."  *Acker v. Gen.*

No. 24-20144

*Motors, L.L.C.*, 853 F.3d 784, 791 (5th Cir. 2017).

In short, because Way does not point to any evidence suggesting that the City failed reasonably to accommodate her fibroids under the ADA, the district court correctly granted summary judgment on Way's fibroid-related failure-to-accommodate ADA and TCHRA claims.

## B. ADA and TCHRA Retaliation

Way alleges that her termination constituted unlawful retaliation in violation of the ADA and TCHRA.[18]  Because Way does not show a causal link between her requests for accommodations and her eventual termination, the City is entitled to summary judgment on those claims.

### 1. Legal Framework

"To establish a prima facie case of retaliation under the ADA . . . a plaintiff must show that (1) she participated in an activity protected under the statute; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse action." *Feist v. Louisiana, Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 454 (5th Cir. 2013).[19]

On prong one, making a request for a reasonable accommodation under the ADA constitutes "participat[ing] in an activity protected under

---

[18] As with Way's ADA and TCHRA discrimination claims, we analyze her ADA and TCHRA retaliation claims concurrently.  *See supra* note 4.

[19] Once an employee makes this showing, the burden shifts to the employer to state a legitimate, non-retaliatory reason for its decision.  The burden then shifts back to the employee to demonstrate that the employer's reason is a pretext for retaliation.  *See Feist*, 730 F.3d at 454.  At that point, to avoid summary judgment, an employee "must show a conflict in substantial evidence on the question of whether the employer would not have taken the action 'but for' the protected activity."  *Id.* (quotation omitted).  But as noted above the line, Way cannot even establish a *prima facie* case of retaliation.

the statute." *Id.*[20]  The ADA also protects "individuals who oppose any practice of discrimination or make a charge of discrimination." *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 304–05 (5th Cir. 2020); § 12203.  On prong two, "dismissal constitutes an adverse action." *Feist*, 730 F.3d at 454.  And on prong three, a "plaintiff alleging retaliation may satisfy the causal connection element by showing close timing between an employee's protected activity and an adverse action against him." *Id.* (cleaned up).

Satisfying the third prong with temporal proximity alone requires the timing to be "very close." *Lyons*, 964 F.3d at 305.  "We have ruled, for example, that a six-and-a-half-week timeframe is sufficiently close, but that a five month lapse is not close enough, without other evidence of retaliation, to establish the 'causal connection' element of a prima facie case of retaliation." *Id.* (footnotes omitted).[21]  A plaintiff unable to establish a causal connection based on temporal proximity alone must point to other evidence, such as "an employment record that does not support dismissal, or an employer's departure from typical policies and procedures." *Feist*, 730 F.3d at 454–55.

### 2. Application

To satisfy the first *Feist* prong, Way avers that she requested reasonable accommodations for her anxiety and uterine fibroids and that she filed an internal complaint of discrimination based on her anxiety.  As discussed

---

[20] *See Tabatchnik v. Cont'l Airlines*, 262 F. App'x 674, 676 (5th Cir. 2008) (per curiam) ("It is undisputed that making a request for a reasonable accommodation under the ADA may constitute engaging in a protected activity."); *Austgen v. Allied Barton Sec. Servs., L.L.C.*, 815 F. App'x 772, 776 (5th Cir. 2020) (per curiam) (assuming that requesting an accommodation satisfies the first prong).

[21] *See also Russell v. Univ. of Tex. of Permian Basin*, 234 F. App'x 195, 207 (5th Cir. 2007) (per curiam) ("[E]vidence of temporal proximity alone cannot sustain an inference of causation when there is a six-month gap between the protected activity and the alleged adverse employment action.").

above, Way adequately communicated her concerns about her anxiety and fibroids to the City. Those communications, in which Way requested accommodations to cope with her conditions, thus constituted protected activities. Way's internal complaint to Russell about Iyamu's conduct toward her likewise constitutes a protected activity under the ADA. *See Lyons*, 964 F.3d at 304–05. Further, Way was later terminated—a quintessential adverse action, *see Feist*, 730 F.3d at 454—so Way can clear the second *Feist* bar too.

But Way stumbles at prong three, which requires her to show a causal link between her protected activities and the adverse action. Way was fired on January 19, 2021. Her protected activities relating to her anxiety—requesting written expectations and complaining about Iyamu to HR—occurred in August and November of 2019. That is far from the "very close" temporal proximity that our caselaw requires to establish a causal link, at least "without other evidence of retaliation." *Feist*, 730 F.3d at 454. But Way's briefing provides no evidence linking the City's eventual elimination of her position to her activities related to her anxiety. So despite meeting the first two *prima facie* prongs, Way does not explain how she satisfies the third. *See Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021) ("A party forfeits an argument by . . . failing to adequately brief the argument on appeal.").

Way's fibroids-based retaliation claims suffer from the same defect: She does not show a causal link between her protected activity and the adverse action. Way engaged in a protected activity by submitting her handwritten request for accommodations on June 15, 2020, seven months before her termination. That date is well outside the "very close" "temporal proximity" our ADA retaliation caselaw requires, *Feist*, 730 F.3d at 454, so Way must establish the causal link between her protected activity and her termination via a different approach. But here again, because Way does not offer "any evidence of a causal link between the protected activity and the adverse action," *id.* at 455, she has not established a *prima facie* case of retaliation, *see*

*Rollins*, 8 F.4th at 397.  The City is thus entitled to summary judgment on Way's ADA and TCHRA retaliation claims.

## C. FMLA Interference

Way brings an unlawful-interference claim under the FMLA, which makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of . . . any right" provided under the law.  29 U.S.C. § 2615(a)(1).  Way contends that upon her return from leave, she suffered an unjustified reduction in pay.  Because nothing in the record suggests that Way received less pay than she was owed, the City is entitled to summary judgment.

### 1. Legal Framework

The FMLA aims to provide job security and reasonable leave for employees with "serious health conditions that prevent them from working for temporary periods."  29 U.S.C. § 2601(a)(4).  The law "requires covered employers to grant covered employees up to twelve weeks of unpaid leave for certain qualifying reasons," *DeVoss v. Sw. Airlines Co.*, 903 F.3d 487, 490 (5th Cir. 2018), including "a serious health condition that makes the employee unable to perform the functions of the position of such employee," 29 U.S.C. § 2612(a)(1)(D).  The FMLA also protects an employee's "right to be re-instated to [her] previous position or an equivalent position upon [her] return from FMLA leave."  *Hester v. Bell-Textron, Inc.*, 11 F.4th 301, 306 (5th Cir. 2021); *see* 29 U.S.C. § 2614(a)(1).

"To establish a prima facie case of interference under the FMLA, a plaintiff must show that (1) [s]he was an eligible employee; (2) [her] employer was subject to FMLA requirements; (3) [s]he was entitled to leave; (4) [s]he gave proper notice of [her] intention to take FMLA leave; and (5) [her] employer denied [her] the benefits to which [s]he was entitled under the FMLA."  *Caldwell v. KHOU-TV*, 850 F.3d 237, 245 (5th Cir. 2017).  Once the plaintiff states a *prima facie* claim, the burden shifts to the employer to

articulate a legitimate reason for the employment action, which the employee can rebut by raising a genuine factual dispute over whether the employer's proffered reason was pretextual. *Id.* Beyond showing that an employer "denied her exercise or attempt to exercise FMLA rights," an employee must also show that the violation prejudiced her. *Cuellar v. Keppel Amfels, L.L.C.*, 731 F.3d 342, 347 (5th Cir. 2013).

### 2. Application

Only the fifth *Caldwell* element is disputed: whether the City denied Way "the benefits to which [s]he was entitled under the FMLA." 850 F.3d at 245. One of those benefits is the right "to be restored to an equivalent position with equivalent . . . pay[.]" 29 U.S.C. § 2614(a)(1)(B). Way and the City agree that she returned to the same position that she held before her leave. The dispute concerns Way's declaration that the City "incorrectly classified [her] FMLA status, leading to a lack of proper notice regarding [her] salary decrease."

The City denies that Way suffered any improper reduction in pay, and Way has not pointed to sufficient evidence in the record to show a genuine dispute of material fact on that point. Way claims that she discovered that her salary was reduced on December 23, 2020. But that assertion is conclusory and belied by the underlying evidence Way's brief invokes. She and the City both point to the same chain of emails among Way, Iyamu, and two human resources employees, all sent between December 17 and 21, 2020. Those emails reveal Way's desire to classify her leave as "family medical leave" rather than "administrative leave." The emails thus could support an inference that the City had entered Way's previous FMLA leave as "administrative" on her timesheet. But there is no indication that the City's possible misclassification would have affected Way's pay because both administrative leave and Way's FMLA leave are unpaid. So even if Way's

assertions are true, she does not show how the City's mistake prejudiced her. *See Cuellar*, 731 F.3d at 347.

In short, because Way points to no evidence beyond her conclusory assertion in her declaration that she suffered an improper pay reduction, the City is entitled to summary judgment on Way's FMLA interference claim.[22]

### D. FMLA Retaliation

Way contends that by terminating her position, the City unlawfully retaliated against her for applying for and taking FMLA leave. Because a reasonable jury could find that that the City's rationale for terminating Way was pretextual, the City is not entitled to summary judgment.

### 1. Legal Framework

FMLA retaliation claims are analyzed under the familiar *McDonnell Douglas* burden-shifting framework. *Wheat v. Fla. Par. Juv. Just. Comm'n*, 811 F.3d 702, 705 (5th Cir. 2016). Most relevant here, to survive summary judgment at the pretext stage, an employee must rebut the reasons given by her employer for its adverse employment action with evidence "of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Campos v. Steves & Sons, Inc.*, 10 F.4th 515, 529 (5th Cir. 2021) (quotation omitted).

----

[22] *See Guzman*, 18 F.4th at 161 ("[W]e have held self-serving affidavits or depositions insufficient to create a fact issue . . . because their contents were either conclusory, vague, or not based on personal knowledge."). And, in a further sign that Way was not prejudiced by the City's classification of her leave, she did not even allege in her amended complaint that she suffered a salary reduction. Way asserted that Iyamu improperly contacted Way while she was on FMLA leave and suggested "improperly" classifying Way's leave as "administrative leave." Way did not allege that the possible misclassification resulted in a decrease in pay. Instead, she asserted that classifying her leave as administrative leave would send "a message that is different from medical leave," *i.e.*, "that Way had done something wrong."

No. 24-20144

An employee can show pretext "using *any* evidence that casts doubt on the credence of [the employer's] reason." *Watkins v. Tregre*, 997 F.3d 275, 284 (5th Cir. 2021) (quotation omitted). An employer's "reason is unworthy of credence if it is not the real reason for the adverse employment action," *id.* (quotation omitted), and evidence "need not be dispositive of pretext to be probative in determining pretext," *id.* at 286 n.7. Examples of evidence that can help demonstrate pretext include falsity of an employer's explanation for its action and close temporal proximity between an employee's protected activity and the employer's action.[23]

An employer cannot escape liability merely because the formal decisionmaker was not motivated by retaliatory animus. Instead, "[u]nder the 'cat's paw' theory of liability," a supervisor's adverse action "may be imputed to . . . the formal decisionmaker, if [the supervisor] played a role in the ultimate" decision. *Haire v. Bd. of Supervisors of La. State Univ.*, 719 F.3d 356, 366 (5th Cir. 2013).[24] "[T]o establish causation under a cat's paw theory," an employee must show (1) that her supervisor, "motivated by retaliatory animus, took acts intended to cause an adverse employment action; and (2) those acts were a but-for cause of" her termination. *Zamora v. City of Hous.*, 798 F.3d 326, 333 (5th Cir. 2015).[25]

---

[23] *See Gee v. Principi*, 289 F.3d 342, 348 (5th Cir. 2002) ("[A] factfinder may infer the ultimate fact of retaliation from the falsity of the explanation."); *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 335 (5th Cir. 2005) (noting that "temporal proximity," when considered with other evidence, can "raise an issue of fact as to whether retaliation" contributed to an employee's termination).

[24] As Justice Scalia explained, the term "cat's paw" derives from one of Aesop's fables in which a monkey induces a cat to extract roasting chestnuts from a fire, burning its paws in the process, and then "makes off with the chestnuts and leaves the cat with nothing." *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011).

[25] Although *Haire* and *Zamora* concern Title VII, their analyses of cat's-paw liability extend to FMLA retaliation cases as well. *See Perkins v. Child Care Assocs.*,

No. 24-20144

In short, to survive summary judgment, Way must show that a reasonable jury could find that the City, acting as the cat's paw of the City Attorney, retaliated against Way for requesting FMLA leave.[26]

## 2. Application

There is no dispute that Way is protected under the FMLA, *see* 29 U.S.C. § 2611(2), (4), and that she suffered an adverse employment action, *see Wheat*, 811 F.3d at 710. Way has also established a causal link between her firing and her FMLA leave, given the proximity between her request for leave and her termination; she requested to extend her leave in December 2020 and was fired in January 2021.[27] The City has offered a nonretaliatory reason for its decision—the City Council's new budget—so the dispute hinges on whether the City's explanation for Way's termination was pretextual.

---

751 F. App'x 469, 475 (5th Cir. 2018) (per curiam) (applying *Zamora* in an FMLA retaliation case); *Marshall v. Rawlings Co.*, 854 F.3d 368, 378 (6th Cir. 2017) ("The rationale for the cat's paw theory applies equally to FMLA retaliation claims as to other types of employment discrimination and retaliation claims"); *Marez v. St.-Gobain Containers Inc.*, 688 F.3d 958, 965 (8th Cir. 2012) (similar).

[26] We assume without deciding that the but-for standard of causation applies to Way's FMLA retaliation claim. In the FMLA context, whether the heightened "but-for" standard or the more plaintiff-friendly "mixed-motive" standard applies is unsettled. *See Decou-Snowton v. Jefferson Par.*, No. 24-30079, 2024 WL 4879466, at *4 n.2 (5th Cir. Nov. 25, 2024) (per curiam) (unpublished). Because Way can satisfy the heightened but-for standard, and because neither party briefed the issue, we need not decide which standard is appropriate in FMLA retaliation claims. *See Campos*, 10 F.4th at 529 n.4 ("[Because] neither party argues on appeal that the mixed-motive framework applies . . . any argument about the continued application of the mixed-motive framework is not for this court's consideration."); *see also Adams v. Mem'l Hermann*, 973 F.3d 343, 353–54 (5th Cir. 2020).

[27] *See Campos*, 10 F.4th at 528 (holding that, in an FMLA retaliation suit, an "adverse employment action [that] occurred approximately one month after [employee's] FMLA leave expired . . . is close enough in time to create a causal connection").

The City's stated reason for terminating Way, provided in its January 2021 letter to her, was that the City Council "took action . . . to eliminate the position of the First Assistant City Attorney . . . to re-deploy the budget for that position to create the position of Junior Associate Assistant City Attorney in the City Attorney's Office." Apparently to explain the City Council's motive behind its redeployment, the letter also noted that in "August of 2019, the City Attorney reported to the City Manager that the position of First Assistant City Attorney was not a practical application of the City's resources in the operation of that department."

We agree with Way that a reasonable jury could find that the City's proffered reason is pretextual. First, the City's explanation is belied by the budget report provided to Iyamu in response to her inquiry into the "budget and staffing" of the City Attorney's office. According to Thompson, the outside expert consulted by Iyamu, the City's law department budget was well within the budgetary norms of comparable local governments. If anything, the legal department's cost per capita appeared "substantially lower" than similar cities. Thompson thus concluded that the City could hire an experienced paralegal at a competitive salary while staying within budgetary norms. During discovery, however, Iyamu stated that she interpreted Thompson's report "to mean the legal division would be better suited by hiring a paralegal instead of an attorney," an interpretation which does not follow from Thompson's recommendation. A reasonable factfinder could "infer the ultimate fact of retaliation" from the apparent falsity of the City's explanation. *Gee*, 289 F.3d at 348.

Considered alongside the City's inconsistent explanation, Way's near-immediate termination after requesting additional FMLA leave provides a further sign of possible pretext. *See Richardson*, 434 F.3d at 335. Way was fired within one month of returning from FMLA leave. That timing could be viewed as suspicious because nearly 18 months passed between

Iyamu's August 2019 message to the City Manager about budgetary priorities and Way's termination in January 2021, during which time the City adopted multiple other budgets that left Way's position intact. The fact that the City terminated Way 18 months after Iyamu suggested eliminating her position but within weeks of Way's returning from and requesting FMLA leave thus could support a jury finding that the City fired Way because it was unhappy with her medical absences, not because budget constraints compelled terminating her position.[28]

The City responds that even if *Iyamu* wanted Way fired for taking FMLA leave, Way does not explain how the *City Council's* vote redeploying the City budget could have been retaliatory given that the city councilors did not know about Way's medical history. But the City's own termination letter to Way stated that it made its decision because Iyamu's report stated that Way's position "was not a practical application of the City's resources." That statement suggests that the Council may have "merely acted as a rubber stamp, or the cat's paw," for Iyamu's animus. *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 227 (5th Cir. 2000) (cleaned up). In other words, the very evidence that the City invokes to justify Way's termination admits that the Council's decision resulted from Iyamu's action, satisfying one prong of the cat's paw liability test.

A reasonable jury could also find that Iyamu was "motivated by retaliatory animus" when she "took acts intended to cause an adverse employment action." *Zamora*, 798 F.3d at 333. In August 2019, the same month when Way divulged that she was seeking medical treatment for anxiety and

---

[28] Way also urges that the method by which the City Council adopted its budget eliminating her position was procedurally improper. Because Way's other allegations provide sufficient evidence of pretext, we need not delve into thorny issues of Texas municipal law to address that argument.

No. 24-20144

that Iyamu told the City Manager that Way's position "was not a practical application of the City's resources," Iyamu asked the HR director how she could demote Way.[29]  Way's declaration also relates several instances supporting her contention that Iyamu "engaged in a continuous pattern of harassment and bullying" toward Way, an assertion backed up by the contemporaneous internal complaint that Way filed.[30]

In short, Way has raised a genuine dispute of material fact as to the real reason for her termination.  The City is thus not entitled to summary judgment on the FMLA retaliation claim.

* * * * *

Way has pointed to sufficient evidence in the record to avoid summary judgment as to her anxiety-related ADA and TCHRA discrimination claims and her FMLA retaliation claim.  But the district court correctly granted summary judgment as to Way's fibroid-related ADA and TCHRA claims, her ADA and TCHRA retaliation claims, and her FMLA interference claim.  The judgment is accordingly AFFIRMED in part and REVERSED in part and REMANDED.  We express no view on the ultimate merits of this case, nor do we place limitations on the matters that the district court may consider on remand.

---

[29] Iyamu emailed Russell asking "how [Iyamu] can reclassify the 'First Assistant City Attorney' position to just 'Assistant City Attorney.'"

[30] *See Perkins*, 751 F. App'x at 475 (concluding that "a reasonable jury could conclude" that a supervisor bore her employee animus based on assertions made in the employee's declaration).